**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 26, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CHRYSTAL D. HAVENS, personal
representative of the estate of Darrell
L. Havens,

      Plaintiff-Appellant,

v.

COLORADO DEPARTMENT OF
CORRECTIONS; STATE OF
COLORADO; RICK RAEMISCH;
TOM CLEMENTS; ARISTEDES
ZAVARES; DAVID JOHNSON;
ROSA FRAYER; DENVER
RECEPTION & DIAGNOSTIC
CENTER,

      Defendants-Appellees.

No. 16-1436

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:14-CV-03024-MSK-MEH)**

---

Edward J. LaBarre, Sausalito, California, for Plaintiff-Appellant.

Robert C. Huss, Assistant Attorney General, Office of the Attorney General,
Denver, Colorado, for Defendants-Appellees.

---

Before **HARTZ**, **HOLMES**, and **BACHARACH**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

Darrell Havens, a former Colorado state prisoner, appealed from the district court's grant of summary judgment against his claims of discrimination on the basis of his disability. Mr. Havens claimed that certain decisions and policies of the Colorado Department of Corrections ("CDOC") caused him to be excluded from access to the facilities and services available to able-bodied inmates of the Colorado prison system, in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and § 504 of the Rehabilitation Act, 29 U.S.C. § 794(a). Following Mr. Havens's death on April 23, 2017, we granted a motion to substitute Chrystal Havens, Mr. Havens's sister and personal representative of his estate, as plaintiff-appellant.[1]

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we now **affirm** the district court's judgment. We first conclude that Mr. Havens's Title II claim is barred by Eleventh Amendment sovereign immunity. Mr. Havens forfeited an argument before the district court that Title II validly abrogates CDOC's asserted

---

[1]     Mr. Havens passed away after he had filed his opening brief and CDOC had filed its response brief. Though we permitted Chrystal Havens to be substituted in this appeal as the plaintiff-appellant following Mr. Havens's death, the parties' briefing (including Mr. Havens's reply brief) refers to Mr. Havens as the challenger and proponent of arguments for reversal on appeal. For clarity's sake and ease of reference, we also attribute arguments of the plaintiff-appellant to Mr. Havens.

2

Eleventh Amendment sovereign immunity and has effectively waived such an argument on appeal by not contending that the court's Eleventh Amendment order constitutes plain error. Accordingly, Mr. Havens has not overcome CDOC's assertion of sovereign immunity, and we accordingly do not reach the merits of his Title II claim. We also conclude that Mr. Havens has failed to make the requisite showing of intentional discrimination under § 504 of the Rehabilitation Act; therefore, this claim fails on the merits. Accordingly, in light of the foregoing, we uphold the district court's judgment in full.

**I**[2]

Mr. Havens was an "incomplete quadriplegic" in the custody of CDOC from 2008 until 2015.[3] Aplt.'s Opening Br. at 4. Early in his incarceration, Mr. Havens was placed at Fort Lyons Correctional Facility ("Fort Lyons") in Bent County, Colorado. Fort Lyons was a CDOC facility able to provide skilled nursing care for offenders like Mr. Havens with significant medical needs.

---

[2] Unless expressly noted, the facts recounted in Part I are essentially undisputed. "[W]e must view the evidence in the light most favorable to" Mr. Havens, as the nonmovant. *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1537 (10th Cir. 1995); *accord Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016).

[3] CDOC's Chief Medical Officer used slightly different terminology, referring to Mr. Havens as "a near-total quadriplegic." Aplt.'s App. at 111 (Def.'s Ex. H, Aff. of Susan Tiona, M.D., dated Jan. 7, 2016). The parties' briefing does not suggest that this difference in terminology is material; indeed, CDOC's brief also refers to Mr. Havens as an "incomplete quadriplegic." Aplee.'s Resp. Br. at 5.

Mr. Havens had access to an exercise yard, day room, and dining hall at Fort Lyons, where he could socialize with the general population of able-bodied inmates. He also had access to a law library and a recreational library for several hours each day. Mr. Havens attended a number of educational programs and was able to obtain a General Educational Development degree ("GED"). Fort Lyons also offered "jobs that [Mr. Havens] could apply for and do." Aplt.'s App. at 183 (Aff. of Darrell Havens, dated Feb. 10, 2016). Mr. Havens had access to "the same benefits as the able-bodied inmates" at Fort Lyons. Aplt.'s Opening Br. at 8.

Fort Lyons closed in 2011, and Mr. Havens was transferred to the Special Medical Needs Unit ("SMNU") at the Denver Reception and Diagnostic Center ("DRDC"). CDOC also considered placing prisoners with special medical needs at La Vista Correctional Facility, which is able to accommodate inmates in wheelchairs.

CDOC placed Mr. Havens at DRDC, however, because it was the only facility able to provide the full-time medical care that Mr. Havens required. Mr. Havens required twenty-four-hour-per-day assistance because he had an "indwelling foley catheter," "was at risk for skin breakdown due to immobility," and "required total assistance for dressing and toileting." Aplt.'s App. at 111–12 (Def.'s Ex. H, Aff. of Susan Tiona, M.D., dated Jan. 7, 2016). The decision to place Mr. Havens at DRDC was reached by a multidisciplinary team that included

4

wardens, clinical staff, and management staff.

DRDC is primarily a facility "designed for the temporary housing of felons coming into the CDOC system for diagnosis, evaluation[,] and classification before being sent to serve their sentences in other correctional facilities." Aplt.'s Opening Br. at 9–10. As a generally temporary facility, DRDC lacked some of the "programs and facilities that were available to inmates in long[-]term correctional facilities." *Id.* at 10.

DRDC has neither a law library nor a recreational library. However, inmates could access the library at the nearby Denver Women's Correctional Facility for part of Mr. Havens's incarceration, and could access legal resources online and other materials by request thereafter.

Mr. Havens was restricted from accessing some of the facilities available to the able-bodied inmates at DRDC on account of his disability. SMNU inmates, like Mr. Havens, were able to access the facilities used by the general population only when staff members were available to accompany them through security barriers, called "sliders," that set the SMNU apart from the rest of the prison. Aplt.'s App. at 185–86, 483 (Def.'s Reply Supp. of Summ. J. Mot., dated Mar. 21, 2016). Consequently, SMNU inmates were mostly limited to the use of a separate day room that contained only a "cabinet with some games in it" and a television. *Id.* at 352 (Dep. of Christopher Gray, dated Sept. 24, 2015). Inmates in the SMNU received their meals in their cells, rather than in the dining hall. The

5

meals often arrived cold but there was a "microwave to reheat the food" available in the SMNU. *Id.* at 187. These restrictions limited Mr. Havens's ability to socialize with inmates apart from "about a dozen other inmates [in the SMNU] who [had] severe disabilities." Aplt.'s Opening Br. at 27–28.

The parties dispute the range of programs and services available to Mr. Havens and the other SMNU inmates. Mr. Havens claimed he did not have access to the same number and variety of educational programs at DRDC that he would have had at other prisons intended for larger and more permanent populations. Notices and sign-up sheets for the available educational programs at DRDC were posted later in the SMNU than in other parts of the prison. Mr. Havens contends that, as a consequence of this late posting, his access to such programs was restricted; indeed, he contends that, due to the late posting, often the programs were fully subscribed before he could sign up for them. However, Mr. Havens was able to complete a number of educational and treatment programs while incarcerated at DRDC, including cognitive behavioral therapy programs, lead abatement and prevention classes, parenting classes, Alzheimer's disease and lift training classes, and an addiction treatment program.

## II

In November 2014, Mr. Havens filed a pro se complaint seeking injunctive relief and damages against CDOC, the State of Colorado, DRDC, and a number of individual defendants. Mr. Havens alleged violations of his federal statutory

6

rights, including claims under Title VI of the Civil Rights Act, 42 U.S.C. § 2000d *et seq.*, Title II of the ADA, and § 504 of the Rehabilitation Act, and also alleged violations (through the vehicle of 42 U.S.C. § 1983) of his constitutional rights under the Fourth, Eighth, and Fourteenth Amendments. The court directed Mr. Havens to file an amended complaint clarifying "how all named parties violated his constitutional rights," Aplt.'s App. at 22 (Order Directing Pl. to File Am. Compl., filed Nov. 11, 2014), and he did so the following month.

Thereafter, pursuant to 28 U.S.C. § 1915(e)(B)(i), the district court *sua sponte* dismissed most of Mr. Havens's claims against virtually all of the defendants as legally frivolous. Notably, after the court's dismissals, the only claims remaining were Mr. Havens's claims against CDOC under Title II and § 504 of the Rehabilitation Act. CDOC then filed an answer, asserting the defense of Eleventh Amendment sovereign immunity against Mr. Havens's Title II damages claim.

Mr. Havens was granted medical parole on July 1, 2015, and obtained counsel the following month. His counsel did not seek leave to further amend the operative (amended) complaint, nor did counsel move the court to reconsider its dismissal rulings regarding Mr. Havens's constitutional claims.

CDOC filed a motion for summary judgment in January 2016, arguing that Mr. Havens's Title II claim was barred by Eleventh Amendment immunity; that Mr. Havens's claims for injunctive relief were mooted by his release on parole;

7

and that Mr. Havens could not recover damages under Title II and § 504 of the Rehabilitation Act because he could not show discriminatory intent.

In response, Mr. Havens argued that CDOC waived its Eleventh Amendment immunity with respect to his Title II claims by accepting federal funds; and that CDOC's discriminatory conduct was intentional or deliberately indifferent, and it was thus "liable . . . for compensatory damages." Aplt.'s App. at 133 & n.8 (Pl.'s Resp. Def.'s Mot. for Summ. J., dated Feb. 19, 2016). Significantly, Mr. Havens did not argue that Title II validly abrogated CDOC's Eleventh Amendment sovereign immunity as to his claim. CDOC replied, reiterating its invocation of immunity, but making clear that it asserted immunity only as to Mr. Havens's Title II damages claim, and not against his Rehabilitation Act claim.[4]

The district court granted summary judgment for CDOC, finding, first, that Mr. Havens's Title II claim was barred by Eleventh Amendment immunity. The court was puzzled by the parties' failure to cite to the Supreme Court's decision in *United States v. Georgia*, 546 U.S. 151 (2006), in which the Court held that Title II validly abrogates sovereign immunity with respect to certain conduct that is also violative of constitutional rights. In this regard, the court noted *Georgia*'s

_____

[4]    Acceptance of federal funds by a state institution waives that institution's Eleventh Amendment immunity with respect to Rehabilitation Act claims. *Arbogast v. Kan. Dep't of Labor*, 789 F.3d 1174, 1182–83 (10th Cir. 2015). The parties do not dispute that CDOC has accepted federal funds.

"clear relevance to the Eleventh Amendment inquiry and [its] factual similarity to this case." Aplt.'s App. at 526 n.3 (Op. & Order, dated Sept. 29, 2016). Though acknowledging that it had previously dismissed Mr. Havens's constitutional claims, the court stated that "the necessary implication of *Georgia* is that at least some Title II ADA claims that do not necessarily implicate constitutional guarantees can nevertheless fall within the category of claims for which Congress validly abrogated states' Eleventh Amendment immunity." *Id.* at 526–27.

The court noted that the "question of whether Congress abrogated states' sovereign immunity in a given situation is a highly-detailed inquiry, requiring extensive review of statutory language and legislative history."[5] *Id.* at 527. And,

_____

[5] In *Georgia*, the Supreme Court established a three-part test for determining whether Title II validly abrogated states' immunity with respect to specific claims in individual cases. 546 U.S. at 159. The court must determine, "on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II." *Id.* The court next considers "(2) to what extent such misconduct also violated the Fourteenth Amendment." *Id.* To the extent that the alleged conduct "*actually* violates the Fourteenth Amendment," including rights incorporated against the states through the Fourteenth Amendment, "Title II validly abrogates state sovereign immunity." *Id.* Finally, "(3) insofar as [] misconduct violated Title II but did not violate the Fourteenth Amendment, [the court considers] whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid" as a congruent and proportional exercise of its authority under § 5 of the Fourteenth Amendment. *Id.* In *Georgia*, the Supreme Court remanded the prisoner's claims with instructions that he be allowed to amend his complaint to clarify which claims were based on alleged conduct that did "*not* independently violate the Fourteenth Amendment." *Id.* Thus, the resolution of the question of whether Title II validly abrogates state sovereign immunity under the Court's *Georgia* rubric could require a court to not only scrutinize the plaintiff's factual claims, but also legislative findings

(continued...)

9

given that "[t]he parties ha[d] not offered to lead [the district court] through such a detailed analysis," the court declined to do so. *Id.* The court reasoned that the party with the burden of proof on the abrogation issue must bear the consequences of the parties' failure "to adequately develop" it, and the court ruled that Mr. Havens was that party. *Id.* Accordingly, the court granted summary judgment in CDOC's favor regarding Mr. Havens's Title II claim based on CDOC's assertion of Eleventh Amendment sovereign immunity. The district court next found that Mr. Havens failed to make the requisite showing of discrimination to support his § 504 Rehabilitation Act claim.

Having disposed of Mr. Havens's claims, the court entered final judgment for CDOC. This appeal followed.

### III

Before the parties' briefing was completed and oral arguments were commenced, we learned informally through a media report—and not from the parties' counsel—that Mr. Havens had died.[6] More specifically, he died on April

---

[5](...continued)
regarding relevant history of disability discrimination involving deprivation of the rights in question. *See id.*; *Guttman v. Khalsa*, 669 F.3d 1101, 1117 (10th Cir. 2012) ("[W]e approach . . . the abrogation inquiry with respect to the specific right and class of violations at issue.").

[6]     We regrettably have had occasion to offer the following admonishment in an earlier case: "The parties' failure to inform the court of this significant development is inexplicable and inexcusable. It is the parties, not the

(continued...)

10

23, 2017. We deemed it necessary and appropriate to assess whether it was proper to go forward and resolve the merits of this appeal under such circumstances. Though we ultimately have determined that we can indeed reach the merits, we delineate the path we traveled to reach this conclusion, given that we found a paucity of legal authority to guide our way. We recognize that the particular circumstances of each case will be important. We set forth our course of action as merely one path—within a conceivable range of reasonable ones—for addressing the circumstances here.

## A

After receiving informal notice of Mr. Havens's death, the court issued an order directing the parties to show cause why the appeal should not be dismissed, noting that neither party had filed a suggestion of death nor moved the court under Federal Rule of Appellate Procedure 43(a)(1) to substitute a personal representative for Mr. Havens's estate. *See* FED. R. APP. P. 43(a)(1) ("If a party dies after a notice of appeal has been filed or while a proceeding is pending in the court of appeals, the decedent's personal representative may be substituted as a party on motion filed with the circuit clerk by the representative or by any

---

[6](...continued)
court, who are positioned to remain abreast of external factors that may impact their case . . . ." *Jordan v. Sosa*, 654 F.3d 1012, 1020 n.11 (10th Cir. 2011). Suffice it to say, this admonishment fits the circumstances of this case to a tee; counsel should have informed us of Mr. Havens's death before we learned of this fact elsewhere.

11

party."). We specifically directed the parties to address whether Mr. Havens's claims survived his death even if there was a proper substitution of a personal representative under Rule 43(a)(1), and whether, in light of Mr. Havens's death, his counsel had the authority to pursue Mr. Havens's claims.

Before the time to respond to the show-cause order had expired, Mr. Havens's counsel filed a motion for substitution of Chrystal Havens as plaintiff-appellant, stating that Ms. Havens had the permission of her parents to maintain her deceased brother's claim, and attaching a document entitled "Collection of Personal Property by Affidavit Pursuant to § 15-12-1201, C.R.S." ("Affidavit"). Mr. Havens's counsel claimed that this affidavit conferred upon Ms. Havens "the right to proceed to attempt to obtain monetary compensation" under Colorado Revised Statute § 15-12-1201. No. 16-1436, Doc. 10497513, at 1–2 (Mot. Substitution of Chrystal Havens as Pl. Aplt., dated Sept. 13, 2017).

Shortly thereafter, the parties responded to the court's order to show cause. Mr. Havens's counsel asserted that Mr. Havens's claims "should survive his death" and that Chrystal Havens had expressed her "desire to be substituted for her brother . . . as the Plaintiff" and had asked counsel to "represent her in the continued prosecution of the case." No. 16-1436, Doc. 10498397, at 1, 7–8 (Aplt.'s Resp. Order to Show Cause Why Appeal Should Not Be Dismissed, dated Sept. 15, 2017). For its part, CDOC did not dispute that Mr. Havens's claims survived his death but contended that "the action will not survive in the absence

12

of a personal representative." *Id.*, Doc. 10498398, at 9 (Def.'s-Aplee.'s Resp. Ct.'s Order to Show Cause, dated Sept. 15, 2017). In this regard, CDOC noted that "[u]nder Colorado state law applying the Colorado survivor statute, a claim must be dismissed for lack of jurisdiction in the absence of a personal representative . . . ." *Id.* With this proposition in mind, CDOC reasoned here that, "[i]n the absence of a personal representative, the appeal will be dismissed for lack of jurisdiction." *Id.* at 10. CDOC's contention that we would lack jurisdiction due to such an absence appeared to be based on the idea that there would be no plaintiff in the action "with standing to sue." *Id.* at 13; *see id.* (noting that Chrystal Havens has not demonstrated that she has "standing to bring a claim on behalf of the Plaintiff or his estate").

The court issued a second order, directing Mr. Havens's counsel to specifically respond to CDOC's argument that this court lacked subject-matter jurisdiction over the appeal due to the absence of a personal representative for Mr. Havens's estate. The court posed three specific questions to Mr. Havens's counsel:

> 1) whether [CDOC] is correct that we currently have no jurisdiction over this action because there is no personal representative here;
>
> 2) if so, is the appointment of a personal representative under Colorado law permissible at this time; and
>
> 3)[] if so, under what time frame could an appointment be made?

13

*Id.*, Doc. 10498430 (Order, dated Sept. 18, 2017). Mr. Havens's counsel responded, arguing that the court maintained jurisdiction; that Colorado Revised Statute § 15-12-108 permitted appointment of a personal representative within three years of the death of the decedent; and that substitution would be permissible under Rule 43(a)(1). Mr. Havens's counsel again argued that Ms. Havens's Affidavit empowered her to serve in the capacity of a personal representative for the purpose of maintaining this appeal.

**B**

Thereafter, the court heard oral arguments on both the merits of the appeal and the issues arising from Mr. Havens's death. Mr. Havens's counsel represented to the court that Chrystal Havens could be formally appointed as personal representative of Mr. Havens's estate under Colorado law. This would obviate the need for the court to definitively opine regarding the effect—if any—of Ms. Havens's Affidavit in this proceeding. Both parties represented to the court that the appointment of Ms. Havens as personal representative would not cause undue hardship to CDOC. Thereafter, in an exercise of discretion, we elected to abate the appeal to allow for the formal appointment of a personal representative under Colorado law for Mr. Havens's estate, and to allow for the filing of a motion to substitute that personal representative as plaintiff-appellant pursuant to Rule 43(a)(1).

A little less than two months later, Chrystal Havens filed a renewed motion

14

for substitution under Rule 43(a)(1), attaching letters of administration demonstrating that she had been appointed as the personal representative of her brother's estate. We granted her motion. Consequently, the sole predicate for CDOC's challenge to our subject-matter jurisdiction—that is, the absence of a personal representative—evaporated. Therefore, even if CDOC was correct that the absence of a personal representative implicated our subject-matter jurisdiction, this potential jurisdictional malady has been cured. Furthermore, we discern no other ground to question *sua sponte* the propriety of our subject-matter jurisdiction. *See, e.g., Citizens Concerned for Separation of Church & State v. City & Cty. of Denver*, 628 F.2d 1289, 1301 (10th Cir. 1980) ("A federal court must in every case, and at every stage of the proceeding, satisfy itself as to its own jurisdiction, and the court is not bound by the acts or pleadings of the parties. . . . This obligation and duty to be watchful of the question of jurisdiction extends full measure to the federal appellate court which must satisfy itself of its own jurisdiction and that of the district court." (citations omitted)). Accordingly, we proceed to the merits.

## IV

### A

"We review the district court's grant of summary judgment . . . de novo, applying the same legal standard as the district court." *Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007); *accord Barber ex rel. Barber v. Colo.*

15

*Dep't of Revenue*, 562 F.3d 1222, 1227 (10th Cir. 2009). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In considering a motion for summary judgment, we "examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party." *Barber*, 562 F.3d at 1228 (quoting *T-Mobile Cent., LLC v. Unified Gov't of Wyandotte Cty.*, 546 F.3d 1299, 1306 (10th Cir. 2008)).

Mr. Havens argues on appeal that Title II of the ADA validly abrogates sovereign immunity with respect to his claim in light of the Supreme Court's decision in *Geogia*. Mr. Havens further argues that the district court erred in deciding that Mr. Havens failed to make the requisite showing of discrimination under § 504 of the Rehabilitation Act.

We conclude that Mr. Havens has forfeited the argument that Title II validly abrogates sovereign immunity as to his claim by failing to raise this argument before the district court, and he has effectively waived the argument on appeal by not arguing under the rubric of plain error. We further hold that the district court did not err in ruling against Mr. Havens with respect to his § 504 claim. Consequently, we uphold the district court's judgment in full.

**B**

The district court granted summary judgment in favor of CDOC on Mr.

16

Havens's Title II ADA claim, finding that sovereign immunity barred money damages, and that Mr. Havens's claim for injunctive relief was mooted by his release from prison. Mr. Havens attacks this judgment on appeal solely on the ground that, because Title II validly abrogates sovereign immunity as to his claim under the Supreme Court's decision in *Georgia*, he may pursue that claim for damages against CDOC. However, Mr. Havens has not preserved this argument for review, and we decline to reach its merits.

More specifically, while Mr. Havens argued that CDOC affirmatively *waived* immunity by accepting federal funds, it is beyond peradventure that Mr. Havens failed to raise an argument for abrogation under the *Georgia* framework before the district court. We ordinarily deem arguments that litigants fail to present before the district court but then subsequently urge on appeal to be forfeited. *See, e.g.*, *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011) (noting that "if the theory simply wasn't raised before the district court, we usually hold it forfeited"); *United States v. Jarvis*, 499 F.3d 1196, 1201 (10th Cir. 2007) (noting that "a litigant's failure to raise an argument before the district court generally results in forfeiture on appeal"); Ian S. Speir & Nima H. Mohebbi, *Preservation Rules in the Federal Court of Appeals*, 16 J. APP. PRAC. & PROCESS 281, 284 (2015) ("[Forfeiture] happens not by a deliberate act, but by neglecting to present an argument to the district court."). Typically, such arguments "may form a basis for *reversal* only if the appellant can satisfy the elements of the plain

17

error standard of review." *Richison*, 634 F.3d at 1130; *see FDIC v. Kans. Bankers Sur. Co.*, 840 F.3d 1167, 1171 (10th Cir. 2016) ("Generally, a forfeited argument will serve as the basis for reversal in a civil matter only if the district court's judgment was plainly erroneous."); *see also Ave. Capital Mgmt. II, L.P. v. Schaden*, 843 F.3d 876, 885 (10th Cir. 2016) ("We may consider forfeited arguments under the plain-error standard.").

Consequently, a litigant's "failure to argue for plain error [review] and its application on appeal—surely marks the end of the road for an argument for reversal not first presented to the district court"—*viz.*, ordinarily, we will not review the argument at all. *Richison*, 634 F.3d at 1131; *accord Bishop v. Smith*, 760 F.3d 1070, 1095 (10th Cir. 2014); *see Fish v. Kobach*, 840 F.3d 710, 729–30 (10th Cir. 2016) (noting that litigant failed to "make an argument for plain error review on appeal" and, as a consequence, his "argument has come to the end of the road and is effectively waived"); Speir & Mohebbi, *supra*, at 301 (noting that "[t]he court will not, on its own, craft a plain-error argument for the appellant"). This is the cold reality facing Mr. Havens: he has not argued for plain-error review on appeal, and, therefore, we may decline any review of his abrogation argument.

To be sure, Mr. Havens's argument relates to Eleventh Amendment sovereign immunity and, therefore, implicates our jurisdiction. *See, e.g., Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 119–20 (1984) (noting

18

that the Eleventh Amendment "deprives a federal court of power to decide certain claims against States that otherwise would be within the scope of Art. III's grant of jurisdiction"); *see also U.S. ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 941 (10th Cir. 2008) (noting that the "Eleventh Amendment immunity doctrine" "contain[s] traits more akin to subject-matter jurisdiction"); *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1231 (10th Cir. 1999) (noting that "the Eleventh Amendment defense has jurisdictional attributes"). And, federal courts unquestionably "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006); *accord 1mage Software, Inc. v. Reynolds & Reynolds Co.*, 459 F.3d 1044, 1048 (10th Cir. 2006); *Devon Energy Prod. Co., L.P. v. Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1208 n.10 (10th Cir. 2012).

However, as the district court recognized, the onus is on Mr. Havens to demonstrate that CDOC's assertion of Eleventh Amendment sovereign immunity does not bar his Title II claim. *See Sydnes v. United States*, 523 F.3d 1179, 1183 (10th Cir. 2008) (cautioning that we must "bear[] in mind that the party asserting jurisdiction bears the burden of proving that sovereign immunity has been waived"); *accord Muscogee (Creek) Nation v. Okla. Tax Comm'n*, 611 F.3d 1222, 1227–28 (10th Cir. 2010); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998) (noting that "the party invoking federal jurisdiction bears the

19

burden of establishing its existence"); *Devon*, 693 F.3d at 1201 ("We 'presume[ ] that a cause lies outside this limited [federal-court] jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction.'" (first alteration in original) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994))). Consistent with this burden allocation, we have made the following observation in the sovereign-immunity context: "Although sovereign immunity and hence subject matter jurisdiction are at issue in this case, our responsibility to ensure even sua sponte that we have subject matter jurisdiction before considering a case differs from our discretion to eschew untimely raised legal theories which may *support* that jurisdiction." *Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1539 (10th Cir. 1992) (emphasis added); *see also McKenzie v. U.S. Citizenship & Immigration Servs., Dist. Dir.*, 761 F.3d 1149, 1155 (10th Cir. 2014) ("To be sure, arguments that the court *lacks* jurisdiction can be raised at any time. But that is because a court without jurisdiction has no authority to decide an issue on the merits. In contrast, when a party presents an unpreserved argument *against* dismissal for lack of jurisdiction, we do not exceed our power by declining to consider the argument."); *Hill v. Kan. Gas Serv. Co.*, 323 F.3d 858, 866 n.7 (10th Cir. 2003) ("Plaintiffs do not here argue that jurisdiction is absent, but rather that jurisdiction exists. Obviously, the concern which justifies the rule exempting such challenges from analysis under the waiver doctrine—that a federal court not decide cases over which it has no jurisdiction under Article III

20

of the Constitution—is lacking where a waiver would not increase the risk of a court proceeding without jurisdiction.  We believe that application of the waiver doctrine is therefore appropriate.").

Therefore, we may deem *forfeited* Mr. Havens's late-blooming argument under *Georgia*—*viz.*, his argument that CDOC's sovereign immunity as to his Title II claim is abrogated—even though his argument implicates our subject-matter jurisdiction.  *See, e.g.*, *Somerlott v. Cherokee Nation Distribs., Inc.*, 686 F.3d 1144, 1151–52 (10th Cir. 2012) (finding lack of preservation of argument challenging tribal sovereign immunity); *Iowa Tribe of Kan. & Neb. v. Salazar*, 607 F.3d 1225, 1231 (10th Cir. 2010) (declining to address forfeited argument against federal government sovereign immunity).  And, because Mr. Havens has not argued for plain-error review, we may further treat his abrogation argument under *Georgia*'s framework as "effectively waived" and, thus, decline to review it at all.  *Fish*, 840 F.3d at 730; *see Richison*, 634 F.3d at 1131.  Consequently, we uphold the district court's judgment against Mr. Havens's Title II claim on Eleventh Amendment sovereign-immunity grounds and do not reach the merits of his Title II claim.

## C

Turning to the merits of Mr. Havens's claim under § 504 of the Rehabilitation Act, we affirm the district court's grant of summary judgment for CDOC, though on somewhat different grounds.

21

In addressing his § 504 claim, the district court first rejected Mr. Havens's allegation of discrimination based upon his individual placement in the SMNU at DRDC, rather than in a prison facility with a greater "breadth of programs and amenities." Aplt.'s App. at 529. The district court found that Mr. Havens had failed to demonstrate a genuine dispute of material fact "as to whether [his] medical needs compelled his placement in the SMNU at DRDC." *Id.* at 531. Second, responding to its "impression that, to some extent, Mr. Havens wishes to challenge CDOC's decision to place the SMNU within DRDC after the closure of Fort Lyons," rather than within a facility with "the amenities and programs typically found at prisons where inmates are housed" on a non-temporary basis, the court noted that it was:

> disincline[d] to take up this strand of argument for numerous reasons, most significantly because the decision of where to locate a given prison unit [] is a textbook example of the type of prison administration decision that *Turner*[7] emphasizes must be

---

7 In *Turner v. Safley*, 482 U.S. 78, 81 (1987), the Supreme Court reviewed regulations promulgated by the Missouri Division of Corrections governing inmate marriages and inmate-to-inmate correspondence. Recognizing that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform," the Court held that, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 84, 89 (quoting *Procunier v. Martinez*, 416 U.S. 396, 405 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989)). The Court noted prudential, institutional, and federalism concerns implicated by judicial review of prison regulations:

(continued...)

22

left to the expertise of CDOC, not usurped by the Court.

*Id.* at 532 n.6. The court further observed, however, that "Mr. Havens' casual suggestions that DRDC was the wrong place to establish the SMNU is far from the type of expert evidence that would be necessary to warrant the Court embarking on such an intrusive examination of CDOC's decisionmaking in this regard." *Id.* Third, and lastly, the court found that Mr. Havens's access to the programs and services at DRDC was "still meaningful," even though "many" of those "activities were constrained, to one degree or another, by restrictions

---

[7](...continued)

> "[T]he problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree." Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have, as we indicated in [*Procunier v. Martinez*], additional reason to accord deference to the appropriate prison authorities.

*Id.* at 84–85 (citation omitted) (quoting *Procunier v. Martinez*, 416 U.S. at 404–05). Further, "[w]here 'other avenues' remain available for the exercise of the asserted right, courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials.'" *Id.* at 90 (citations omitted) (first quoting *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 131 (1977), then quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974)). The Court later reaffirmed in *Thornburgh* the principle that prisoners' "rights must be exercised with due regard for the 'inordinately difficult undertaking' that is modern prison administration." 490 U.S. at 407 (quoting *Turner*, 482 U.S. at 85).

23

imposed for security, medical, administrative, or logistical reasons." *Id.* at 534.

**1**

"To establish a prima facie claim under § 504, a plaintiff must demonstrate that '(1) plaintiff is handicapped under the Act; (2) [he] is "otherwise qualified" to participate in the program; (3) the program receives federal financial assistance; and (4) the program discriminates against plaintiff'" based upon a disability. *Barber*, 562 F.3d at 1228 (quoting *Hollonbeck v. U.S. Olympic Comm.*, 513 F.3d 1191, 1194 (10th Cir. 2008)); *accord Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015); *Gorman v. Bartch*, 152 F.3d 907, 911 (8th Cir. 1998); *Duffy v. Riveland*, 98 F.3d 447, 454 (9th Cir. 1996).

"The Supreme Court has recognized that § 504 is intended to ensure that 'an otherwise qualified handicapped individual [is] provided with *meaningful access* to the benefit that the grantee offers . . . . [T]o assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made.'" *Barber*, 562 F.3d at 1229 (alterations in original) (emphasis added) (quoting *Alexander v. Choate*, 469 U.S. 287, 301 (1985)); *accord Mark H. v. Lemahieu*, 513 F.3d 922, 937 (9th Cir. 2008). "Section 504 seeks to assure evenhanded treatment and the opportunity for handicapped individuals to participate in and benefit from programs receiving federal assistance. The Act does not, however, guarantee the handicapped equal results" from participation in such programs and services. *Alexander*, 469 U.S. at 304 (citation omitted); *cf.*

24

*Nunes v. Mass. Dep't of Corr.*, 766 F.3d 136, 146 (1st Cir. 2014) (holding, in the context of a prisoner's claim against a prison system, that § 504 "entitle[s] [a disabled individual] to reasonable accommodations, not to optimal ones finely tuned to his preferences"). The plaintiff bears the burden of establishing that the defendant "discriminated against the handicapped" in the offered program or service by failing to provide meaningful access to the program and service, "such that the need for a remedial interactive process aimed at finding a reasonable accommodation was triggered." *Barber*, 562 F.3d at 1233 (Gorsuch, J., concurring).

In construing the scope of liability under § 504 of the Rehabilitation Act, we may not only reference cases decided under that statute, but also cases decided under Title II of the ADA. "The ADA enlarges the scope of the Rehabilitation Act to cover private employers, but the legislative history of the ADA indicates that Congress intended judicial interpretation of the Rehabilitation Act to be incorporated by reference when interpreting the ADA." *Nielsen v. Moroni Feed Co.*, 162 F.3d 604, 608 n.7 (10th Cir. 1998); *accord Mauerhan v. Wagner Corp.*, 649 F.3d 1180, 1186 n.6 (10th Cir. 2011); *see also* 42 U.S.C. § 12201 ("Except as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 (29 U.S.C. 790 et seq.) . . . .").

25

Mr. Havens seeks only damages on appeal based on his § 504 claim,[8] and "[t]o recover compensatory damages under § 504, a plaintiff must establish that the agency's discrimination was intentional." *Barber*, 562 F.3d at 1228; *see Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999) ("We agree with the course charted by our sister circuits and hold that entitlement to compensatory damages under section 504 of the Rehabilitation Act requires proof the defendant has intentionally discriminated against the plaintiff."); *accord Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 342 (11th Cir. 2012); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009); *Delano-Pyle v. Victoria Cty.*, 302 F.3d 567, 574 (5th Cir. 2002); *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001); *see also Meagley v. City of Little Rock*, 639 F.3d 384, 390 (8th Cir. 2011) (noting that "[e]very circuit court to address the issue . . . has reaffirmed that intentional discrimination must be shown to recover compensatory damages" under the Rehabilitation Act).

Deliberate indifference is sufficient to satisfy the intentional-discrimination requirement for compensatory damages under § 504: "[I]ntentional

---

[8] Actually, in his appellate briefing, Mr. Havens argues that he is entitled to compensatory damages under *both* Title II and § 504. *See* Aplt.'s Opening Br. at 38. Here, we address only whether Mr. Havens has satisfied the requisite showing as to his claim under § 504 because we have previously determined in Part IV.B, *supra*, that Mr. Havens effectively waived his only argument challenging CDOC's assertion of Eleventh Amendment sovereign immunity and, therefore, we cannot reach the merits of his Title II claim.

discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." *Powers*, 184 F.3d at 1153; *accord Barber*, 562 F.3d at 1228–29; *see also J.V. v. Albuquerque Pub. Schs.*, 813 F.3d 1289, 1298 & n.6 (10th Cir. 2016) (citing *Barber* and applying "the same standard to ADA intentional discrimination cases because, '[t]o the extent feasible, we look to decisions construing the Rehabilitation Act to assist us in interpreting analogous provisions of the ADA'" (alteration in original) (quoting *Cohon ex rel. Bass v. N.M. Dep't of Health*, 646 F.3d 717, 725 (10th Cir. 2011))); *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013) (following "in the footsteps of a majority of our sister courts and hold[ing] that a showing of deliberate indifference may satisfy a claim for compensatory damages under § 504"); *Liese*, 701 F.3d at 348 (adopting a deliberate-indifference standard based, in part, upon "the overwhelming body of circuit case law, and [a] review of the pertinent [statutory] analogs"); *Meagley*, 639 F.3d at 389 (citing *Barber* and adopting a deliberate-indifference standard).

This deliberate-indifference standard is consistent with the purposes animating the Rehabilitation Act. In this regard, "the Supreme Court has instructed the Rehabilitation Act was adopted not only to curb 'conduct fueled by discriminatory animus,' but also to right 'the result of apathetic attitudes rather than affirmative animus.'" *Powers*, 184 F.3d at 1152 (quoting *Alexander*, 469

27

U.S. at 295 ("Discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect.")). The deliberate-indifference standard "does not require a showing of personal ill will or animosity toward the disabled person." *Barber*, 562 F.3d at 1228; *Meagley*, 639 F.3d at 389 (quoting *Barber*, 562 F.3d at 1228). The plaintiff must show, however, "(1) [that the defendant had] 'knowledge that a harm to a federally protected right [was] substantially likely,' and (2) 'a failure to act upon that . . . likelihood.'" *Barber*, 562 F.3d at 1229 (omission in original) (quoting *Duvall*, 260 F.3d at 1139); *accord J.V.*, 813 F.3d at 1298; *S.H.*, 729 F.3d at 265.

As to the second prong, "failure to act [is] a result of conduct that is more than negligent, and involves an element of deliberateness." *Barber*, 562 F.3d at 1229 (alteration in original) (quoting *Lovell v. Chandler*, 303 F.3d 1039, 1056 (9th Cir. 2002)); *accord J.V.*, 813 F.3d at 1298; *see Duvall*, 260 F.3d at 1139 (observing that "bureaucratic slippage" does not amount to deliberate indifference, nor does "deliberate indifference . . . occur when a duty to act may simply have been overlooked"); *Ferguson v. City of Phoenix*, 157 F.3d 668, 675 (9th Cir. 1998) (holding that "not uncommon bureaucratic inertia" in updating a city's 9-1-1 system to make it accessible to the hearing-disabled, coupled with "some lack of knowledge and understanding" about regulatory requirements, did not amount to deliberate indifference); *cf. McCulley v. Univ. of Kan. Sch. of Med.*,

28

591 F. App'x 648, 651 (10th Cir. 2014) (unpublished) (holding that summary judgment for the defendant was appropriate where a university "engaged in an iterative process with [the plaintiff] and allowed her ample opportunity to request accommodations and demonstrate their feasibility," showing that it "was hardly indifferent to [the plaintiff's] need for accommodations").

Our *Barber* decision is particularly illustrative with regard to this second prong's application. In *Barber*, this court addressed claims by a mother and daughter challenging a Colorado statute that required drivers under the age of sixteen to practice only "under the supervision of [a licensed] parent, stepparent, or guardian"; the plaintiffs claimed that the statute discriminated against them under § 504 on account of the mother's blindness, which prevented her from holding a driver's license. 562 F.3d at 1225 (quoting COLO. REV. STAT. § 42–2–106(1)(b)). We held that the "evidence, even in the light most favorable to [the plaintiffs], simply would not support a finding that the [Colorado Department of Motor Vehicles ("DMV")] failed to act in response" to the plaintiffs' complaint, where "the DMV took adequate steps to ameliorate the situation by engaging in discussion about [a limited form of] guardianship [that would allow the daughter to drive under the supervision of her grandfather] and pursu[ed] legislative amendment." *Id.* at 1229–30, 1233. "The mere fact that the [defendant] did not accept [the mother's] suggested [accommodation] d[id] not establish a deliberate indifference to her situation or her rights." *Id.* at 1232.

29

## 2

The district court's summary-judgment analysis seemed to primarily turn on the question of whether CDOC discriminated against Mr. Havens at all (i.e., quite apart from whether it did so *intentionally*) by placing him in the SMNU at DRDC and implementing specific security and access policies limiting his access to some of the programs and facilities available to able-bodied inmates at DRDC. The court answered this question in the negative. In light of the services and programs that seriously disabled inmates like Mr. Havens *did* have access to—evidenced in part by the fact that Mr. Havens completed a number of educational programs—the district court found that Mr. Havens had "meaningful access." Aplt.'s App. at 534.

Notably, the parties' arguments primarily focus not on the discrimination *vel non* question but rather on whether any allegedly discriminatory conduct by CDOC was the product of deliberate indifference (i.e., intentional) and, thus, a predicate for compensatory damages under § 504. In light of the parties' defining of the ground of contention, we are content to focus our analysis on the issue of discriminatory intent, as the record is adequate to support our review. *See Bennett v. Spear*, 520 U.S. 154, 166 (1997) ("A respondent is entitled . . . to defend the judgment on any ground supported by the record."); *Elkins v. Comfort*, 392 F.3d 1159, 1162 (10th Cir. 2004) ("We have discretion to affirm on any ground adequately supported by the record."). In doing so, however, we

30

acknowledge that the antecedent question of discrimination *vel non*—whether Mr.

Havens was denied meaningful access to the programs and activities of

DRDC—significantly helps to define the contours of our reasoning with respect to

the question of deliberate indifference (i.e., discriminatory intent).

Mr. Havens claims on appeal that CDOC demonstrated deliberate

indifference in: (1) its decision to place and operate a SMNU in DRDC, a

generally temporary facility with less accessible infrastructure for disabled

persons and fewer programs for long-term prisoners; and (2) its establishment or

implementation of specific security and access policies of the SMNU that further

restricted Mr. Havens's access to the facilities used by the general, able-bodied

population at DRDC.[9]

More specifically, as for the decision to locate and operate a SMNU at

DRDC, Mr. Havens argues that "[w]hen the CDOC made the policy decision to

establish [a SMNU] at DRDC . . . it should have been apparent to CDOC policy

makers that the pursuit of that policy decision would lead to deprivations of the

---

[9]     Mr. Havens unsuccessfully argued before the district court that the decision to place him personally in the SMNU at DRDC, rather than another facility with a greater range of programs and amenities, was discriminatory. *See* Aplt.'s App. at 160–61. He does not pursue this argument on appeal; accordingly, we deem it abandoned and waived. *See Coleman v. B-G Maint. Mgmt. of Colo., Inc.*, 108 F.3d 1199, 1205 (10th Cir. 1997) ("Issues not raised in the opening brief are deemed abandoned or waived."). Reflecting his abandonment of this argument, Mr. Havens has not attempted to rebut CDOC's claim that "[Mr.] Havens'[s] medical needs and care levels were the overriding factor in determining [his] placement" in the SMNU. Aplee.'s Resp. Br. at 28.

Plaintiff's rights under the Rehab Act . . . ."  Aplt.'s Opening Br. at 39–40.  Mr. Havens points out the absence of a law library and recreational library at DRDC, along with "architectural, transportation[,] and communication barriers[;] . . . minimal facilities[;] . . . [and] limited activities, benefits, jobs and other opportunities."  *Id.* at 39.  Mr. Havens argues that CDOC's decision to place and operate a SMNU at DRDC, despite knowledge of these limitations, amounted to deliberate indifference to a substantial likelihood that Mr. Havens would be denied his statutory right of non-discriminatory, meaningful access to state benefits.

As for the SMNU's specific security and access policies, Mr. Havens contends that he "suffered segregation and discrimination that was simply the result [of] CDOC policies that were unreasonable," including policies that limited his computer access, required him to eat his meals in his cell, and "prohibit[ed] Mr. Havens] from interacting or associating with the able-bodied inmates at DRDC."  *Id.* at 19.  Mr. Havens argues that CDOC "must have known that its policies to segregate the inmates in the SMNU from the other inmates at DRDC" would violate his rights under the Rehabilitation Act.  *Id.* at 40.

**3**

The fundamental weakness of both of Mr. Havens's claims is that neither (1) the choice to place and operate a SMNU at DRDC, or (2) the specific security and access policies governing the SMNU demonstrates deliberate indifference on

the part of CDOC, *see Barber*, 562 F.3d at 1229, because Mr. Havens has not shown that CDOC had knowledge that either course of conduct would result in a substantial likelihood of harm to his federally protected rights (i.e., § 504 rights).

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . ." *McCullum v. Orlando Reg'l Healthcare Sys., Inc*, 768 F.3d 1135, 1147 (11th Cir. 2014) (articulating the deliberate indifference standard with respect to the plaintiff's ADA and Rehabilitation Act claims) (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was 'obvious.'" *Id.* (quoting *Farmer*, 511 U.S. at 842); *see also Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1197 (10th Cir. 2007) ("That is, the entity will know of the individual's need for an accommodation because it is 'obvious.'").

There is no significant or meaningful direct evidence of such knowledge in this case. Nor is there a reasonable probability that such knowledge on CDOC's part can be inferred from the circumstances. With the SMNU located and operating at DRDC, disabled inmates, like Mr. Havens, actually *did* have considerable access to programs and activities available to the general population of able-bodied inmates. In light of the evidence before us, we cannot say that risk of harm to Mr. Havens was "obvious." *McCullum*, 768 F.3d at 1147.

33

In other words, we would be hard-pressed to circumstantially discern a triable inference that CDOC had knowledge of a substantial likelihood of harm to the federal rights of Mr. Havens, as well as other disabled inmates, in the placement and operation of the SMNU and in the fashioning of its specific security and access policies, when the actual operations of the SMNU evinced no such harms or objective indications that such harms were substantially likely to occur. That is, the SMNU's actual operations at DRDC demonstrate that, contrary to Mr. Havens's contention, it would not have been obvious to the prison officials in placing and operating the SMNU at DRDC or in fashioning SMNU's specific security and access policies that doing so would be substantially likely to infringe the federal rights of disabled inmates like Mr. Havens. *See Meagley*, 639 F.3d at 389 (concluding that there was "no evidence that the zoo knew [its] bridges . . . did not comply with ADA guidelines" where there had been no prior incidents involving the bridges, and an internal evaluation failed to note any compliance issue); *cf. Farmer*, 511 U.S. at 844 (noting under an Eighth Amendment deliberate-indifference standard that "a trier of fact may infer knowledge from the obvious" but that "does not mean that it must do so").

Far from establishing such knowledge, the circumstances here would suggest that any concerns by CDOC regarding harms to the § 504 rights of disabled inmates, like Mr. Havens, in the placing and operating of the SMNU at the DRDC or in fashioning SMNU's specific security and access policies at the

34

DRDC would have been purely speculative and conjectural.  Even assuming, *arguendo*, one could colorably argue that CDOC was negligent in not discerning such a substantial likelihood under these circumstances, that would not be good enough.  *See S.H.*, 729 F.3d at 266 n.26 ("Deliberate indifference requires *actual knowledge*; allegations that one would have or 'should have known' will not satisfy the knowledge prong of deliberate indifference" (quoting *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012))).

We turn now to examine the circumstances of the actual operations of the SMNU.  Mr. Havens recognizes—and the record before the district court reflected—multiple accommodations the CDOC implemented to ensure that Mr. Havens and his fellow disabled inmates in the SMNU would retain meaningful access to programs and services while incarcerated at DRDC.

In particular, CDOC provided full-time aides and designed a prison job that Mr. Havens was able to perform.  Mr. Havens was given computer access, albeit for limited periods of time when a computer was available, and had access to online legal resources as well as recreational books and media by request.  CDOC provided a separate day room inside the SMNU.  And Mr. Havens could access other parts of the facility with the assistance of staff members, when staff were available.  The provision of these accommodations disinclines us to hold that CDOC had "actual knowledge" of the risk of harm to Mr. Havens, *id.* (emphasis omitted); it in fact suggests the opposite.  *See, e.g.*, *McCullum*, 768 F.3d at

35

1148–49 (affirming summary judgment on deliberate indifference grounds because the defendant hospital had "provided several accommodations," and because the plaintiff could not demonstrate that the hospital "knew it was substantially likely that the accommodations that were provided were ineffective").

In addition, the fact that Mr. Havens completed a number of educational and training programs while incarcerated at DRDC also suggests that the district court correctly found he was not denied meaningful access to such programs. And, more to the point, his ability to complete a meaningful selection of such programs is evidence that CDOC would not have been aware of a substantial likelihood that Mr. Havens, as well as other disabled SMNU inmates, would suffer violations of his federal rights by CDOC's decision to place and operate the SMNU in DRDC and its decision to fashion and implement the specific security and access policies for the SMNU at issue. In other words, Mr. Havens's successful participation in DRDC's educational and training programs forcefully militates against any reasonable inference that the risk that his § 504 rights would be (or were being) violated was "obvious." *Robertson*, 500 F.3d at 1197.

In sum, in light of these accommodating measures and evidence that inmates of the SMNU at DRDC retained meaningful access to prison programs and services, CDOC cannot be charged with "knowledge that a harm to a federally protected right [was] substantially likely" to result from the decision to

36

place and operate the SMNU at DRDC, let alone with "a failure to act upon that . . . likelihood." *Barber*, 562 F.3d at 1229 (alteration in original) (quoting *Duvall*, 260 F.3d at 1139). Furthermore, a panel of this court has cogently held, "it is not necessary for [a prison system] to duplicate programs [available in each facility] in all other facilities." *Whitington v. Moschetti*, 423 F. App'x 767, 771 (10th Cir. 2011) (unpublished). Mr. Havens has not shown that CDOC was aware of a substantial likelihood that the above measures were insufficient to ensure meaningful access to the programs and activities at DRDC. And, under the reasoning of *Whitington*, the fact that those programs and activities were more modest than those available at other penal facilities in the CDOC is not determinative of whether Mr. Havens's § 504 rights were violated. *See also Alexander*, 469 U.S. at 304 (Section 504 "does not . . . guarantee the handicapped equal results"); *cf. Pierce v. Cty. of Orange*, 526 F.3d 1190, 1221, 1222 & n.38 (9th Cir. 2008) (noting that "[t]he ADA does not require perfect parity among programs offered by various facilities that are operated by the same umbrella institution," although "concerns associated with inequalities between different facilities" required the county to implement some kind of accessibility plan to remedy excessive inequalities between offerings, viewed "as a whole").

Further, based upon substantially the same undisputed facts, Mr. Havens has not shown that CDOC actually had knowledge of a substantial likelihood that the specific security and access policies of DRDC at issue here—which governed

37

the movement and activities of SMNU inmates—would deprive them, and in particular Mr. Havens, of meaningful access to programs and services. CDOC addressed inmates' limited mobility outside of the SMNU by, among other things, providing online access to legal resources, books and media by request, and a day room within the SMNU.

And the district court persuasively reasoned that CDOC's security and access policies at DRDC did not deprive Mr. Havens, and other SMNU disabled inmates, of meaningful participation in DRDC's services and programs.[10] The court noted that Mr. Havens could socialize freely within the SMNU and travel to other parts of DRDC with the assistance of prison staff. The court further emphasized from the undisputed facts that Mr. Havens had worked prison jobs; had taken classes; had access to books and media; and "had some degree of law library access, enough that he was able to pursue multiple lawsuits." Aplt.'s App.

---

[10] Even if meaningful participation were not provided, it would not be conclusive as to the question of whether CDOC possessed the requisite knowledge to establish deliberate indifference. *See S.H.*, 729 F.3d at 266, 267 & n.26 ("[L]iability in this case is not dependent merely on whether the School District's psychologists erred in their determinations. The relevant inquiry is knowledge, and evidence that the School District may have been wrong about S.H.'s diagnosis is not evidence that the School District had *knowledge* that it was a wrong diagnosis."); *McCullum*, 768 F.3d at 1148 ("[T]here is no evidence suggesting that the staff's written notes were ineffective as auxiliary aids or, *assuming that they were*, that the nurses and doctors at Parrish *knew* that fact." (emphases added)); *see also Robertson*, 500 F.3d at 1197 ("[T]he entity will know of the individual's need for an accommodation because it is 'obvious.'"). The district court's reasoning, however, serves to significantly solidify the bases of our conclusion that Mr. Havens cannot prevail on his § 504 claim.

38

at 532–33.

The district court's sound reasoning is congruent with our view that meaningful access and the question of whether accommodations are reasonable must be assessed through the prism of the prison setting.[11]  *See Turner*, 482 U.S.

---

[11]  To be clear, at issue here is not whether *Turner*'s analytical framework relating to legitimate penological interests applies full force to claims based on statutory rights, like those embodied in § 504, as well as to constitutional rights.  There appears to be some debate among our sister circuits about this.  *Compare Onishea v. Hopper*, 171 F.3d 1289, 1300 (11th Cir. 1999) (en banc) (noting that "*Turner* does not, by its terms, apply to statutory rights"), *and Yeskey v. Pa. Dep't of Corr.*, 118 F.3d 168, 174 (3d Cir. 1997) (noting that the question of whether *Turner* applies to statutory rights is "controversial and difficult"), *aff'd*, 524 U.S. 206 (1998), *with Torcasio v. Murray*, 57 F.3d 1340, 1355 (4th Cir. 1995) ("Given the leeway prison officials are accorded where their actions threaten constitutional rights of inmates, it follows *a fortiori* that prison officials enjoy similar flexibility with respect to inmates' statutory rights . . . ."), *and Gates v. Rowland*, 39 F.3d 1439, 1447 (9th Cir. 1994) (finding *Turner* "equally applicable to the statutory rights created by the [ADA]" in the prison context).  And we apparently have not directly ruled on the subject.  Rather, our point here is a limited one: *viz.*, *Turner* recognized that administrators face unique circumstances and challenges in the prison setting and, just as that Court took them into account in fashioning its analytical rubric, we believe that—at the very least—it is appropriate and prudent to take these variables into account in attempting to discern under § 504 whether a prisoner's access to prison services and programs was meaningful and whether the prison reasonably accommodated the prisoner's disability.  And there is certainly support in the cases of our sister circuits for at least this limited reference to the concerns underlying *Turner*'s rubric.  *See Onishea*, 171 F.3d at 1300 ("[E]ven if the district court's importation of *Turner*'s standards into the Rehabilitation Act was not precisely correct as a matter of legal theory, determining whether penological concerns impose requirements for program participation is not error."); *Torcasio*, 57 F.3d at 1355; *Gates*, 39 F.3d at 1447.

These variables would include "security and cost," *see Onishea*, 171 F.3d at 1300,  and "maintaining . . . order[,] and operating an institution in a manageable fashion," *Castle v. Eurofresh, Inc.*, 731 F.3d 901, 911 (9th Cir. 2013) (quoting

(continued...)

39

at 84–85; *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 78 (2d Cir. 2016) ("[P]risons are unique environments where 'deference to the expert views' of prison administrators is the norm." (quoting *Pierce*, 526 F.3d at 1217)). Prison officials have the obligation to consider security and other factors unique to the prison environment in their decision-making, and courts have accorded them considerable discretion to do so. *See Onishea v. Hopper*, 171 F.3d 1289, 1300 (11th Cir. 1999) (en banc); *Torcasio v. Murray*, 57 F.3d 1340, 1355 (4th Cir.

---

[11](...continued)
*Pierce*, 526 F.3d at 1217)). And these particular variables have played a significant role in resolving the question of meaningful access or accommodations in favor of prison administrators. *See Wagoner*, 778 F.3d at 592–93 (holding prisoner was not "deni[ed] [] services within the meaning of [§ 504]" on account of "longer waits and humiliation" caused by transportation in a van unable to accommodate his wheelchair); *Nunes*, 766 F.3d at 146 (holding prisoner was not denied "meaningful access" to medication by requirement that he wait in line to receive it, and summary judgment for the defendant was appropriate, despite his "back pain, chronic diarrhea, and other illnesses" that made waiting in line difficult, where prison offered the use of a rolling walker and ability to sit or leave the line to use the bathroom as accommodations); *Lue v. Moore*, 43 F.3d 1203, 1206 (8th Cir. 1994) (holding that "[the plaintiff's] argument that the defendants should have sent him off prison grounds for training fails because [§ 504] does not require the defendants to give handicapped inmates preferential treatment"); *Journey v. Vitek*, 685 F.2d 239, 241–42 (8th Cir. 1982) (affirming judgment for the defendant after bench trial because the record supported the court's factual finding that the plaintiff had not been denied meaningful access to "educational, rehabilitative, [and] recreational . . . programs" by assignment to a prison infirmary on the second floor, where he depended upon help from unreliable "inmate friends" to "transport him up and down the . . . stairs to inmate recreational activities"); *see also Hollis v. Howard*, No. 16-5115, 2016 WL 9804159, at *2 (6th Cir. Dec. 21, 2016) (unpublished) (holding prisoner was not denied meaningful access, and failed to state a claim under § 504, where he had been able to attend programs and services with the assistance of other inmates, despite prison's failure to assign him an inmate aide).

1995).  As the Fourth Circuit held, in *Torcasio*:

> In view of [the] consensus that any rights prisoners enjoy—including the right of disabled inmates to some degree of accommodation—must be assessed in light of the requirements of prison administration, [the defendants] could certainly have reasonably concluded that their actions were consistent with "[the plaintiff's] right to the modification of specific [prison] services and facilities."
>
> . . . .
>
> This portfolio of accommodations of course did not satisfy all of [the plaintiff's] requests, but certainly could have been viewed by a reasonable prison administrator as a satisfactory accommodation of whatever right [the plaintiff] had to modification of prison facilities [and policies] . . . .

57 F.3d at 1356 (fourth alteration in original).[12]

---

[12]     To be sure, the late posting of sign-up sheets for vocational and educational programs gives us some pause with regard to Mr. Havens's claim of deliberate indifference, as the accommodation requested by Mr. Havens—i.e., timely posting of such information in the SMNU—seemingly could have been accomplished by CDOC with little burden.  *Cf. Onishea*, 171 F.3d at 1301 (noting that *Turner* deference to prison policies may be overcome where the plaintiff shows "'easy alternatives' that come at a de minimis cost to valid penological interests" (quoting *Turner*, 482 U.S. at 91)).  However, as discussed above, Mr. Havens was apparently able to complete a number of educational and training programs, and he failed to identify any specific programs from which he had been excluded by late posting of notices in the SMNU.  Therefore, we cannot conclude that a reasonable inference could be made that CDOC had knowledge that there was a substantial likelihood that any "bureaucratic slippage," *Duvall*, 260 F.3d at 1139, in the timely posting of program notices would infringe Mr. Havens's federally protected rights (as well as those of similarly situated SMNU inmates), *see McCullum*, 768 F.3d at 1147 (noting that "the very fact that the risk was 'obvious'" would permit a jury to "conclude that a prison official knew of a substantial risk" (quoting *Farmer*, 511 U.S. at 842)); *Meagley*, 639 F.3d at 389 (concluding that there was "no evidence that the zoo knew [its] bridges . . . did not comply with ADA guidelines" where there had been no prior incidents involving the bridges, and an internal evaluation failed to note any compliance

(continued...)

In light of the foregoing, Mr. Havens has not carried his burden of showing that CDOC had "knowledge that a harm to a federally protected right [was] substantially likely." *Barber*, 562 F.3d at 1229 (quoting *Duvall*, 260 F.3d at 1139). Accordingly, Mr. Havens cannot establish the deliberate indifference (i.e., intentional discrimination) necessary to recover damages under § 504. And, because that is the only remedy Mr. Havens seeks, his § 504 claim undisputedly must fail.

**4**

Mr. Havens argues, without citing controlling authority, that "the issue of intent is not appropriate for summary judgment." Aplt.'s Opening Br. at 20. It is true that courts are cautious about resolving questions of intent in summary-judgment proceedings. *See Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir. 1995) ("Judgments about intent are best left for trial . . . ."); *Romero v. Union Pac. R.R.*, 615 F.2d 1303, 1309 (10th Cir. 1980) (debatable issues of motive and intent are "particularly inappropriate for summary judgment disposition"). However, on many occasions, we have affirmed summary judgment for a defendant based upon the absence of any genuine dispute of material fact regarding discriminatory intent.

---

[12](...continued)
issue); *cf. Farmer*, 511 U.S. at 844 (noting under an Eighth Amendment deliberate-indifference standard that "a trier of fact may infer knowledge from the obvious" but that "does not mean that it must do so").

42

Notably, we affirmed summary judgment for the defendants in *Barber* against a § 504 damages claim upon a finding that the plaintiffs failed to raise a triable issue of fact regarding discriminatory intent. 562 F.3d at 1229, 1233. Furthermore, our caselaw in analogous contexts amply demonstrates that such issues of intent may be resolved in summary judgment. *See, e.g.*, *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1268 (10th Cir. 2015) (affirming summary judgment for the defendant against Civil Rights Act Title VII and ADEA claims); *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1066 (10th Cir. 2009) (affirming summary judgment for the defendant against a Civil Rights Act Title VII claim); *Bryant v. Indep. Sch. Dist. No. I-38 of Garvin Cty.*, 334 F.3d 928, 930 (10th Cir. 2003) (affirming summary judgment, in part, for the defendant against a Civil Rights Act Title VI claim); *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1324 (10th Cir. 1997) (affirming summary judgment for the defendant against an ADA Title I claim).

Indeed, in two of these cases, the court acknowledged the need to treat issues of discriminatory intent cautiously at the summary judgment stage, but nevertheless held that the plaintiff had failed to offer a showing sufficient to raise a genuine dispute of material fact for trial. *See, e.g.*, *Pinkerton*, 563 F.3d at 1066 ("Certainly, '[i]t is not the purpose of a motion for summary judgment to force the judge to conduct a "mini-trial" to determine the defendant's true state of mind.' . . . However, Ms. Pinkerton did not present . . . evidence [upon which a

jury could infer discriminatory motive], and therefore has not established a genuine issue for trial on the retaliation claim." (alteration in original) (citation omitted) (quoting *Randle*, 69 F.3d at 453)); *Morgan*, 108 F.3d at 1324 ("Even though all doubts concerning pretext must be resolved in plaintiff's favor, a plaintiff's allegations alone will not defeat summary judgment."). Accordingly, we reject Mr. Havens's assertion that the issue of intent is categorically inappropriate for resolution on summary judgment. This assertion stands as no obstacle to our conclusion that, as to his § 504 claim, Mr. Havens has failed to make a sufficient showing to raise a genuine dispute of material fact regarding discriminatory intent under the deliberate-indifference standard. Accordingly, for the reasons explicated *supra*, that claim fails on the merits.

## V

For the reasons discussed above, we **AFFIRM** the judgment of the district court.