**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 16, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

WILLIAM MICHAEL CROTHERS;
ROBERT CHARLES ROSEN,

    Plaintiffs - Appellants,

and

PETER MULDOON,

    Plaintiff,

v.

MATT CARR, Teton County Sheriff, in
his individual and official capacities; ERIN
WEISMAN, Teton County Prosecuting
Attorney, in her individual and official
capacities; BRETON BOMMER, Teton
County Sheriff's Department Deputy,
individually; DAVID HODGES, Teton
County Sheriff's Department Deputy,
individually; CLAYTON PLATT, Teton
County Sheriff's Department Deputy,
individually; ANDREW ROUNDY, Teton
County Sheriff's Department Deputy,
individually; CLARK ALLAN, Teton
County Deputy Prosecutor, individually,

    Defendants - Appellees.

No. 23-8014
(D.C. No. 2:22-CV-00028-NDF)
(D. Wyo.)

_____

**ORDER AND JUDGMENT**[*]

_____

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Before **McHUGH**, **EID**, and **ROSSMAN**, Circuit Judges.

_____

In 2019, a group of law enforcement officers and prosecutors in Teton County, Wyoming investigated and prosecuted Robert Charles Rosen and William Michael Crothers based on allegations of sexual assault against them. Both men ultimately prevailed against the accusations: the prosecutors dropped the charges against Rosen before trial, and Crothers was acquitted of his sexual assault charge after trial. Feeling that they had been unfairly targeted, Rosen and Crothers subsequently sued several law enforcement officers in the Teton County Sheriff's Office (the "TCSO defendants," collectively)[1] and several prosecutors in the Teton County Prosecutor's Office (the "TCPO defendants," collectively).[2]

Rosen and Crothers brought several claims (together and separately) under 42 U.S.C. § 1983, alleging, *inter alia*, violations of the Fourth and Fourteenth Amendments, municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and violations of state law.[3] The TCSO and TCPO defendants

---

[1] The TCSO defendants consist of Teton County Sheriff Matt Carr (sued in both his official and individual capacities) and Deputies Breton Bommer, David Hodges, Clayton Platt, and Andrew Roundy (sued in their individual capacities).

[2] The TCPO defendants consist of the Teton County Prosecutor's Office, Prosecuting Attorney Erin Weisman (sued in both her official and individual capacities), and Chief Deputy Prosecutor Clark Allan (sued in his individual capacity).

[3] The lawsuit also involved a third plaintiff, Peter Muldoon, who was the mayor of Jackson Hole, Wyoming from 2016 until 2020. Muldoon initially filed a notice of appeal on a single First Amendment retaliation claim under § 1983, but thereafter voluntarily moved to dismiss his appeal. This Court granted his motion. *See Crothers, et al. v. Carr, et al.*, No. 23-8014, slip op. at 2 (10th Cir. June 30,

moved for summary judgment, which the district court granted as to all sixteen claims. Rosen and Crothers appealed. Reviewing the issues de novo, we affirm.

## I.

Robert Charles Rosen and William Michael Crothers are two strangers who found themselves in similar predicaments. Both men were accused of sexual assault—wrongfully, they allege. Eventually, both prevailed against the accusations. But during each of their prosecutions, both men experienced what they contend was unlawful conduct by law enforcement officers and prosecutors in Teton County, Wyoming.

### A.

The allegations against Rosen were brought in September 2019, when Rosen was seventeen years old. Another minor, I.U., alleged that Rosen sexually assaulted her while they were at Rosen's house after hanging out at a music festival and at a country club. Deputy Breton Bommer, an investigator with the Teton County Sheriff's Office ("TCSO"), interviewed I.U. shortly after she made her allegations. During the interview, I.U. provided details of the assault; she also told Deputy Bommer that while she was with Rosen, she texted her friends, pleading for them to pick her up so that she could get away (although she did not provide screenshots of those text messages until months later). After the interview, Deputy Bommer believed he had probable cause to arrest Rosen, but he delayed doing so.

---

2023) (order). Because Muldoon is no longer a party to this appeal, we do not discuss the facts related to his claims.

3

Later that month, another minor, M.R., also came forward with sexual assault allegations against Rosen. M.R. reported that, while at Rosen's house one night, Rosen physically dragged M.R. into his bedroom with his arm around her neck, took her phone, locked the door, and assaulted her. In an interview with TCSO Deputies David Hodges and Clayton Platt, M.R. also identified two other individuals who were present the night of the alleged assault, at least one of whom she claimed saw and overheard parts of the assault.

Rosen was arrested for first-degree sexual assault against I.U. and M.R. in December 2019—ten days after he turned eighteen. Clark Allan, a prosecutor for the Teton County Prosecutor's Office ("TCPO"), later stated that "some investigators expressed that they wanted to wait to file the case until after [Rosen's eighteenth] birthday." R. at 28. Despite waiting over two months to arrest Rosen, none of the investigators interviewed either of the two alleged witnesses to M.R.'s assault. Additionally, during the investigation, Deputy Bommer repeatedly made disparaging comments about Rosen, calling him "creepy" and comparing him to Jeffrey Dahmer, and he likewise expressed that investigators waited to arrest Rosen until he was eighteen so that they "could charge him as an adult." *Id.* at 31–32.

At some point during his prosecution, Rosen learned that I.U. had also possibly been abused by a local physical education ("PE") teacher. The same TCSO officers investigated the PE teacher as had investigated Rosen, but they did not pursue the investigation to the same extent. Deputy Bommer—who knew the PE teacher personally through coaching football—did not speak with I.U. about the matter until months after he

4

learned about it. Indeed, neither Deputy Bommer nor any other TCSO investigator ever conducted interviews regarding the PE teacher's conduct. Deputy Bommer later agreed that he had probable cause to arrest the PE teacher, but he never did so.

The TCPO eventually dropped all of the charges against Rosen.

**B.**

Like Rosen, Crothers became the target of sexual assault allegations in 2019. One evening, Crothers—who was then fifty-two years old—became "very intoxicated" while at a bar. R. at 33. When he got home, Crothers discovered that his seventeen-year-old son was having a party and had invited a number of other minors to the home.

Crothers did not shut the party down and instead joined in on drug use with his son's friends. He allegedly made a vulgar comment to a minor-aged girl that he "needed some p***y" and described the girl as a "hot piece of a**." *Id.* at 34. Crothers then allegedly hugged another minor-aged girl, grabbed her buttocks, and kissed her twice, despite the girl's efforts to stop him. Crothers also attempted to kiss another minor-aged girl on the lips (but ended up kissing her cheek) and placed his hand on her upper thigh. Crothers later admitted that he could not remember any of his conduct due to his drunkenness.

Crothers's actions came to the attention of the TCSO when one of the girls he kissed told a school counselor, who then relayed the information to Deputy Andrew Roundy, another TCSO investigator. Roundy then interviewed four teenagers who attended the party, including the girl who first reported Crothers's conduct.

5

Roundy also interviewed Crothers about his alleged conduct and issued him three citations. Roundy did not arrest Crothers at that time, however. Nor did he cite Crothers for sexual battery or assault; instead, the citations were for (1) unlawful contact with the minor-aged girl, (2) hosting a house party with minors present, and (3) breach of peace. The TCPO later offered Crothers a plea deal, but he rejected it. After Crothers rejected the plea deal, the TCPO added a charge for sexual battery and another unlawful-contact charge.

Clark Allan—the same TCPO prosecutor who handled Rosen's case—was assigned to Crothers's case. Before the case went to trial, Allan allegedly stated: "I have been waiting my entire career for a case like this. I'm sick and tired of these rich guys . . . having zero regard for the law and drinking and using drugs with no consequences." *Id.* at 38. Allan also made an offhand remark about how the case would be picked up by the media and how certain things about the case could be said to the media. Soon after, information about Crothers's case found its way into a local newspaper.

Later, Allan described the atmosphere at Crothers's trial as "a zoo." *Id.* According to Allan, "[t]he courtroom was packed" and had "a line of people outside of the courtroom waiting to get inside," something Allan had "never seen" in his twenty-plus years of practice. *Id.*

A jury convicted Crothers of three of six charges against him. Specifically, although the jury convicted Crothers of two unlawful contact charges and the house party charge, Crothers was acquitted of the sexual battery charge, one of the unlawful contact charges, and the breach-of-peace charge.

6

**C.**

After prevailing on their respective sexual-assault charges, Rosen and Crothers sued several TCPO and TCSO officers, bringing a host of federal and state claims. First, Rosen and Crothers brought several claims under 42 U.S.C. § 1983, alleging (among other things) that the TCPO and TCSO defendants violated their constitutional rights under the Fourth and Fourteenth Amendments. Rosen and Crothers also brought claims under *Monell*, alleging that municipal policies and failures of individual supervisors at both the TCPO and TCSO caused their constitutional injuries. Finally, the plaintiffs brought several supplemental-jurisdiction claims for negligence and intentional infliction of emotional distress under Wyoming law.

The TCPO and TCSO defendants all moved for summary judgment. In addition to asserting defenses on the merits, the TCPO defendants asserted Eleventh Amendment sovereign immunity, absolute prosecutorial immunity, and qualified immunity, and the TCSO defendants asserted qualified immunity. The district court granted summary judgment in favor of the defendants on all of Rosen's and Crothers's claims, holding that there was no genuine dispute of material fact as to whether the TCPO and TCSO defendants violated their constitutional rights. Crothers and Rosen appealed.

Specifically, Rosen appeals the district court's grant of summary judgment on his § 1983 claims, including two claims under the Fourth Amendment and two claims under

the Fourteenth Amendment.[4]  Crothers appeals the grant of summary judgment on his

§ 1983 claims involving a Fourteenth Amendment right-to-fair-trial claim and a Fourth

Amendment malicious-prosecution claim.[5]  In addition, Rosen and Crothers collectively

appeal their related *Monell* claims and their state law claims.  We address each set of

claims in turn.

But before turning to those claims, we first set out the applicable standard of

review.  We review the "district court's grant of summary judgment de novo, applying

the same legal standard as the district court." *Wilkins v. City of Tulsa*, 33 F.4th 1265,

1271–72 (10th Cir. 2022) (quotation omitted).  We will grant "summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those

that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty*

---

[4] Rosen did not appeal his § 1983 claim involving a Fourteenth Amendment fabrication-of-evidence issue.  We therefore do not address this portion of the district court's order.

[5] Crothers initially also raised an issue on appeal regarding a motion he filed seeking to remove certain confidentiality protections from the transcript of one defendant's deposition.  Specifically, the district court previously entered a protective order that permitted either party to designate certain information as confidential and restricted from disclosure. *See* App'x Vol. II at 437–40.  When one TCPO defendant designated portions of his deposition transcript as confidential, Crothers filed a motion requesting that the district court remove the confidentiality designation because the deposition excerpts described certain exculpatory evidence, which Crothers claimed was critical to a separate habeas petition of his. *See* App'x Vol. III at 536–38.  After the district court granted summary judgment, it dismissed Crothers's pending motion as moot.  R. at 64.  Crothers initially appealed that determination, *see* Aplt. Br. at 55–56, but thereafter voluntarily moved to dismiss his claim because the TCPO defendant agreed to disclose the deposition excerpts, *see* Reply Br. at 4 n.4.  We therefore do not address this issue.

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "[s]ummary judgment is inappropriate where . . . 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Roberts v. Jackson Hole Mountain Resort Corp.*, 884 F.3d 967, 972 (10th Cir. 2018) (quoting *Anderson*, 477 U.S. at 248).

In applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party, but we do not make "credibility determinations or weigh[] the evidence." *Roberts*, 884 F.3d at 971 n.3 (quotation omitted).

## II.[6]

We begin with Rosen's claims. Rosen raises two Fourth Amendment arguments and two Fourteenth Amendment arguments. As we explain, all four fail.[7]

---

[6] With respect to all of the individual-capacity claims, the TCPO defendants (Erin Weisman and Clark Allan) reassert on appeal their earlier arguments that they are entitled to both absolute prosecutorial immunity and qualified immunity from all of Rosen's and Crothers's claims. *See* TCPO Br. at 37–43.

The district court expressly declined to address either immunity defense, opting instead to resolve each claim on the merits. *See* R. at 64. Neither party asserts that this approach was error; the TCPO defendants raise their immunity arguments only as alternative grounds for affirmance. But because we affirm on the merits, we need not wade into these immunity arguments for the first time. Although absolute immunity and qualified immunity are ordinarily threshold issues that analytically precede the merits of a plaintiff's claim, the Supreme Court has noted that neither is jurisdictional. *Nevada v. Hicks*, 533 U.S. 353, 373 (2001). Thus, although it may not always be advisable, it is at least permissible to address the merits of a plaintiff's claim instead of dismissing it based on an immunity defense.

[7] As a preliminary matter, Rosen asserts that the district court improperly granted summary judgment on his Fourteenth Amendment equal protection claim and his two Fourth Amendment claims with respect to the TCPO defendants, because the TCPO defendants did not properly move for summary judgment on those grounds.

Regarding Rosen's Fourth Amendment claims, the district court's grant of summary judgment in favor of the TCPO defendants was not error. Rosen correctly

**A.**

Rosen raises two related Fourth Amendment claims, one for malicious prosecution and another for a violation of *Franks v. Delaware*, 438 U.S. 154, 171 (1978). He bases both claims on the "theory [] that a knowing and reckless disregard for the truth permeated [the TCSO defendants'] investigation from the moment they received their initial reports." Aplt. Br. at 31. As Rosen sees things, the TCSO defendants, from the

---

points out that the TCPO defendants' summary-judgment motion confused the facts underlying the prosecutions at issue in this case with the facts of a separate, unrelated prosecution against Rosen. But the district court acknowledged that point and properly concluded that it still had sufficient grounds upon which to dispose of the Fourth Amendment claims against the TCPO defendants, based on the undisputed facts in the record and the overlapping arguments regarding the TCSO defendants. *See* R. at 44 n.12.

Regarding Rosen's equal protection claim, he is correct that the district court effectively decided the issue *sua sponte*, given that the TCPO defendants did not actually move for summary judgment on that claim (and only mentioned it in their reply brief below). *See* App'x Vol. I at 211–22; App'x Vol. II at 293. Although we usually do not "favor the granting of summary judgment *sua sponte*, a district court may do so if 'the losing party was on notice that [he] had to come forward with all of [his] evidence.'" *Johnson v. Weld County*, 594 F.3d 1202, 1214 (10th Cir. 2010) (Gorsuch, J.) (quoting *Scull v. New Mexico*, 236 F.3d 588, 600 (10th Cir. 2000)). "And even if such notice is lacking, we will still affirm a grant of summary judgment if the losing party suffered no prejudice from the lack of notice." *Id.*

Here, we conclude that although the district court did grant summary judgment *sua sponte* to the TCPO defendants on Rosen's equal protection claim, Rosen has failed to demonstrate prejudice. Indeed, although Rosen's equal protection claim named the TCPO defendants, he has not provided—before us or before the district court—any evidence that would demonstrate their liability on that claim. And he makes almost the exact same arguments for liability on appeal as he did before the district court. To that end, there is "no indication that the district court's subsequent grant of summary judgment on the claim prevented [Rosen] from offering additional evidence or argument to defend [his] claim." *Id.* Thus, because Rosen's argument on appeal "relies on exactly the same evidence and arguments [he] made before the district court, and [because he] identifies no way in which [he] was prejudiced by the district court's chosen procedural course," we hold that the district court's grant of summary judgment to the TCPO defendants was procedurally proper. *Id.*

beginning of their investigation, "had access to evidence . . . that undermined the accusers' credibility and vitiated probable cause, but they intentionally ignored it." *Id.* at 31–32. And because of that conduct, Rosen claims, the TCSO defendants' warrant for Rosen's arrest was invalid, and his arrest violated the Fourth Amendment.

To prevail on his malicious-prosecution claim, Rosen was required to demonstrate five things: that (1) the TCSO defendants caused his "continued confinement or prosecution"; (2) "the original action terminated in [his] favor"; (3) "there was no probable cause to support [his] initial arrest, continued confinement, or prosecution"; (4) the TCSO defendants "acted with malice"; and (5) Rosen "sustained damages." *Bledsoe v. Carreno*, 53 F.4th 589, 614 (10th Cir. 2022). "Malice may be inferred if a defendant causes the prosecution without arguable probable cause." *Stonecipher v. Valles*, 759 F.3d 1134, 1146 (10th Cir. 2014).

Meanwhile, to prevail on his *Franks* claim, Rosen was required to show that the TCSO defendants, when seeking his arrest warrant, "knowingly, or with reckless disregard for the truth, include[d] false statements in a supporting affidavit or omit[ted] information which, if included, would prevent the warrant from lawfully issuing." *Kapinski v. City of Albuquerque*, 964 F.3d 900, 905 (10th Cir. 2020). When a *Franks* claim is based on omitted information, the plaintiff must demonstrate that "the omitted information was 'material' in that its inclusion would have vitiated probable cause for issuing the warrant." *Id.* Moreover, to demonstrate a "reckless disregard for the truth," the plaintiff must point to "evidence that the officer[s] in fact entertained serious doubts as to the truth of [the] allegations" or had "obvious reasons to doubt the veracity of the

11

allegations." *Stonecipher*, 759 F.3d at 1142 (quoting *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994)).

We address these two claims together because, to prevail on either, Rosen would need to show that probable cause did not exist at the time of the TCSO defendants' actions and that the TCSO defendants acted at least recklessly. He failed to do so.

Rosen first argues that the TCSO defendants knowingly or recklessly ignored two readily available eyewitnesses to one of the alleged assaults—both of whom were identified by the accuser herself—and instead blindly relied on the accusers' allegations. "Such a disregard for plainly available evidence," Rosen claims, cannot be attributed to "an innocent mistake or simple negligence." Aplt. Br. at 35.

But it can. We have repeatedly explained that "[t]he failure to investigate a matter fully, to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence rarely suggests a knowing or reckless disregard for the truth. To the contrary, it is generally considered to be token negligence at most." *Stonecipher*, 759 F.3d at 1142 (quoting *Beard*, 24 F.3d at 116).

Rosen acknowledges as much. *See* Aplt. Br. at 34 (citing *Beard*, 24 F.3d at 116). Still, he resists our view of his argument, maintaining instead that he "is not alleging that [the TCSO defendants] failed to interview enough witnesses or chase down all the available leads." *Id.* But we see no other way to understand his claim. After all, Rosen's claim rests almost entirely on the fact that the TCSO defendants "conducted no additional investigation in the months between" I.U.'s and M.R.'s accusations and his eventual arrest. *Id.* at 34–35. As explained, that fact alone—even viewed in the light most

12

favorable to Rosen—is not enough to show that the TCSO defendants acted with a knowing or reckless disregard for the truth, nor that their failure to interview all potential witnesses vitiated probable cause.

Relatedly, Rosen also argues that the TCSO defendants knowingly or recklessly disregarded evidence that obviously undermined the two accusers' motivations and credibility. For instance, Rosen points out that I.U. and M.R. brought their allegations one week apart from each other, in what he claims was a coordinated effort spearheaded by his ex-girlfriend, who was close with both accusers. Rosen also notes that both accusations were "cold," meaning that they were made months after the assaults allegedly occurred. *Id.* at 36–37. Moreover, Rosen mentions that Deputy Bommer, who initially interviewed I.U., did not question how I.U.'s intoxication at the time of the alleged assault may have affected her memory, and that I.U. did not produce the text messages that she claimed corroborated her allegations until months after her interview, once Rosen had already been arrested.

But Rosen does not explain how any of those circumstances undermined probable cause. "Probable cause is based on the totality of the circumstances, and requires reasonably trustworthy information that would lead a reasonable officer to believe that the person about to be arrested has committed or is about to commit a crime." *Cortez v. McCauley*, 478 F.3d 1108, 1116 (10th Cir. 2007) (en banc) (citing *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). We have held that, in general, a victim's own statement to police may independently establish probable cause "absent some reason to think the statement not trustworthy," particularly when law enforcement officers directly interview

13

the victim.  *Id.* at 1121–22; *see Easton v. City of Boulder*, 776 F.2d 1441, 1449–50 (10th Cir. 1985).

Accordingly, I.U.'s interview alone was sufficient to establish probable cause to arrest Rosen; M.R.'s subsequent interview supplied an even stronger basis.  Although Rosen suggests that the TCSO defendants should have been more skeptical or asked additional questions, he does not allege that the TCSO defendants "in fact entertained serious doubts as to the truth of [I.U. and M.R.'s] allegations."  *Kapinski*, 964 F.3d at 908.  And none of the circumstances he points to "evinc[e] obvious reasons" for the TCSO defendants to doubt the allegations.  *Id.* (quoting *Beard*, 24 F.3d at 116).  As to the timing of the allegations, Rosen provides no authority suggesting that victims' coordination or delay in bringing allegations undermines the veracity of those allegations for purposes of probable cause.  Indeed, the sole case that Rosen cites, *United States v. Patane*, rejects the proposition that a delay in reporting allegations to law enforcement necessarily vitiates probable cause.  304 F.3d 1013, 1016–17 (10th Cir. 2002), *rev'd on other grounds*, 542 U.S. 630 (2004).

To be sure, the TCSO defendants' failure to investigate may not have been "top-notch policing."  *Harte v. Bd. of Comm'rs of Cnty. of Johnson*, 864 F.3d 1154, 1178 (10th Cir. 2017) (Phillips, J., writing separately).  But that does not mean it violated the Fourth Amendment.  Once the TCSO defendants had sufficient probable cause, they had no obligation to "exhaust every possible lead, interview all potential witnesses, [or] accumulate overwhelming corroborative evidence."  *Stonecipher*, 759 F.3d at 1142 (quoting *Beard*, 24 F.3d at 116).

14

Because Rosen has failed to identify any evidence indicating that the TCSO

defendants lacked probable cause or acted recklessly when investigating and arresting

him, we affirm the district court's grant of summary judgment on both of his Fourth

Amendment claims.

**B.**

Next, we consider Rosen's claim that the TCSO defendants violated his

Fourteenth Amendment due process rights by tactically delaying his prosecution until

shortly after his eighteenth birthday in order to charge him as an adult.

The Fourteenth Amendment provides that no state shall "deprive any person of

life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The

Supreme Court long ago recognized that the Due Process Clause[8] provides one source of

protection "against oppressive delay" in the prosecution of criminal defendants. *United

States v. Lovasco*, 431 U.S. 783, 789 (1977); *United States v. Marion*, 404 U.S. 307, 324

(1971).[9] Specifically, government actors violate the Due Process Clause when they

---

[8] The Supreme Court has addressed pre-indictment delays in the context of the
Fifth Amendment's Due Process Clause, which applies to the federal government.
*United States v. Lovasco*, 431 U.S. 783, 789 (1977); *United States v. Marion*, 404 U.S.
307, 324 (1971)). Although neither the Supreme Court nor this Circuit have squarely
addressed whether the Fourteenth Amendment's Due Process Clause extends equally to
pre-indictment delays in state court proceedings, we have suggested that it does. *See
Martinez v. Romero*, 661 F.2d 143, 144 (10th Cir. 1981) (addressing merits of challenge
to pre-indictment delay brought under the Fourteenth Amendment); *Mitchell v. Watkins*,
252 F. App'x 874, 875, 879–80 (10th Cir. 2007) (same); *Wright v. Deland*, 986 F.2d
1432 (10th Cir. 1993) (table) (same).

[9] The Due Process Clause protects against delays between the time of the
alleged crime and the indictment. *See Marion*, 404 U.S. at 323–24. Criminal statutes
of limitation provide another source of protection against such pre-indictment delays.
*Id.* at 322–23. Meanwhile, the Sixth Amendment, which establishes the right to a

15

intentionally delay an indictment in order "to gain tactical advantage over the accused," but only if the pre-indictment delay "caused substantial prejudice to [the accused's] right to a fair trial." *Marion*, 404 U.S. at 324.

With that in mind, our Circuit "has understood the Supreme Court to have 'establish[ed] a two-pronged due process test against which to measure pre-indictment delay.'" *United States v. Garcia*, 74 F.4th 1073, 1098 (10th Cir. 2023) (quoting *United States v. Revada*, 574 F.2d 1047, 1048 (10th Cir. 1978)).  To demonstrate that a pre-indictment delay violates a litigant's right to due process, the litigant must demonstrate: (1) "actual prejudice resulting from the pre-indictment delay" and (2) "that the delay was purposefully designed to gain tactical advantage or to harass" the litigant.  *Revada*, 574 F.2d at 1048.  A litigant "must satisfy *both* parts of the two-pronged test in order to obtain any relief for pre-indictment delay." *United States v. Murphy*, 100 F.4th 1184, 1209 (10th Cir. 2024) (emphasis in original).

Applying that framework, the district court concluded that Rosen "easily met his burden" under the second prong because he "raise[d] a material question of fact" as to whether the TCSO defendants intentionally delayed arresting and charging him until he was eighteen.  R. at 49.  On the first prong, however, the district court concluded that Rosen failed to establish prejudice.

---

speedy trial, and the Speedy Trial Act, *see* 18 U.S.C. § 3161, supply two other protections against oppressive prosecutorial delay, but only in the post-indictment context, *see Marion*, 404 U.S. at 321–22.

We agree.  Even assuming the delay in charging Rosen was tactical, Rosen has failed to demonstrate how that delay prejudiced him.  In Rosen's view, the pre-indictment delay prejudiced him by depriving him of "his right to access the confidentiality protections of juvenile court," which he would have been able to access more easily had he been charged before his eighteenth birthday.  Aplt. Br. at 44.[10]  That is wrong for several reasons.

First, Rosen has no right under Wyoming law to the confidentiality protections of a juvenile court proceeding.  Wyoming law permits a prosecutor to charge a juvenile in adult court where, as here, the alleged crime is first-degree sexual assault.  *See* Wyo. Stat. Ann. §§ 14-6-203(f)(v), 6-1-104(a)(xii).  Thus, even if Rosen had been charged while he was seventeen years old, those charges could have been brought in adult court.

---

[10] Rosen frames his purported "right" as a "property interest," seemingly structuring his argument as one based in procedural due process.  Aplt. Br. at 39–44.  Neither the Supreme Court nor this Circuit have clearly explained whether a Fourteenth Amendment tactical-delay claim sounds in procedural due process, substantive due process, or something else.  Rosen tiptoes around the issue, too: although he suggests his claim is rooted in procedural due process, he never discusses or applies the test for procedural due process claims developed in *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976), and its progeny.

It is unclear to us how Rosen's claim would fit under that framework (if it could fit at all).  But if Rosen "wishes to claim a constitutional right, it is incumbent on him to tell us where it lies, not to assume . . . that it must be in there *someplace*."  *Cordova v. City of Albuquerque*, 816 F.3d 645, 661 (10th Cir. 2016) (Gorsuch, J., concurring in the judgment) (emphasis in original).  Without any clear argument from the parties under the traditional procedural due process framework, we will not apply that framework here.  Instead, we analyze Rosen's claim under the two-prong test developed from *Marion*, *Lovasco*, and their progeny.  We note, though, that Rosen's claim would fail under either approach, because no matter how he frames his purported "right," it is not a legally cognizable interest.

17

It is true, as Rosen points out, that Wyoming law permits individuals charged in adult court to file a motion to transfer the case to juvenile court. *See id.* § 14-6-237(a). But that procedure does not give rise to a separate right or entitlement to have a case tried in juvenile court, nor to access the confidentiality protections of juvenile court. Although Wyoming law requires state trial courts to consider certain requisite factors in determining whether to transfer a case to juvenile court, *see id.* § 14-6-237(b), "the manner in which [the trial court] weighs the evidence" and "relate[s] that evidence to the statutory factors" is discretionary and case-specific, *Hansen v. State*, 904 P.2d 811, 828 (Wyo. 1995); *Rosen v. State*, 503 P.2d 41, 50 (Wyo. 2022) (noting that, under Wyoming law, the decision to transfer a case to juvenile court is "committed to the sound discretion" of the trial court).

Rosen himself recognizes that fact. Aplt. Br. at 42 (acknowledging "[t]he possibility that the Wyoming state district court could have applied the determinative factors to Rosen's case and arrived at a different conclusion" than what he sought). Yet he insists that the mere existence of mandatory factors necessarily limits a state trial court's discretion in such a way as to create a "right to a particular result" when an individual brings a motion to transfer their case to juvenile court. *Id.* But, again, Rosen's argument fails because Wyoming law grants trial courts broad discretion to weigh and evaluate the mandatory factors.

Thus, Rosen cannot demonstrate that he would have been entitled to have his case tried in juvenile court (and thus cannot demonstrate that he would have been entitled to the juvenile court confidentiality protections). Because he cannot do so, Rosen's claim of

prejudice is too speculative to demonstrate that the tactical delay in charging him deprived him of his due process rights. We therefore affirm the district court's grant of summary judgment on Rosen's Fourteenth Amendment tactical-delay claim.

## C.

Rosen's final argument is that the TCSO defendants violated his right to equal protection under the Fourteenth Amendment because they only investigated him and not the PE teacher who had also allegedly assaulted I.U.

The Fourteenth Amendment's Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. "Generally speaking, equal-protection jurisprudence is 'concerned with governmental action that disproportionately burdens certain classes of citizens.'" *A.M. v. Holmes*, 830 F.3d 1123, 1166 (10th Cir. 2016) (quoting *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215–16 (10th Cir. 2011)). Nevertheless, the Supreme Court has permitted a "class-of-one" variant of equal protection claims, under which a litigant asserts that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). Still, "[w]e have approached class-of-one claims with caution, wary of 'turning even quotidian exercises of government discretion into constitutional causes.'" *Kan. Penn Gaming*, 656 F.3d at 1216 (quoting *Jicarilla Apache Nation v. Rio Arriba County*, 440 F.3d 1202, 1209 (10th Cir. 2006)).

To prevail on a class-of-one equal protection claim, a plaintiff must show that the defendants treated him differently than other similarly situated persons accused of similar

19

offenses.  *See Holmes*, 803 F.3d at 1167–68; *Requena v. Roberts*, 893 F.3d 1195, 1210

(10th Cir. 2018).  Individuals are "similarly situated" only if they are alike "in all relevant

respects."  *Requena*, 893 F.3d at 1210 (quotation omitted).  Thus, Rosen must show that a

"difference in treatment was without rational basis, that is, that the government action

was irrational and abusive, and wholly unrelated to any legitimate state activity."  *Kan.*

*Penn Gaming*, 656 F.3d at 1216 (cleaned up).  "This standard is objective—if there is a

reasonable justification for the challenged action, we do not inquire into the government

actor's actual motivations."  *Id.*

Here, the fundamental difference between Rosen's case and that of the PE teacher

is that two alleged victims were willing to pursue charges against Rosen, while none were

willing to pursue charges against the PE teacher.  Indeed, I.U.—an alleged victim of both

Rosen and the PE teacher—specifically agreed to pursue charges against the former but

specifically declined to pursue charges against the latter.  Objectively, this creates a

material difference between Rosen and the PE teacher.  That material difference not only

means Rosen and the PE teacher were not "similarly situated," but it also supplies a

rational basis for the TCSO defendants to treat Rosen's investigation differently.

Rosen, however, argues that the TCSO defendants did not have a rational basis for

their actions because their decision not to investigate the PE teacher was pretextual.

Specifically, Rosen argues that Deputy Bommer declined to investigate the PE teacher

because he knew the teacher personally.  But under the objective standard applied to

class-of-one equal protection claims, Deputy Bommer's personal motivations for

declining to investigate the PE teacher are irrelevant.  *See Kan. Penn Gaming*, 656 F.3d

20

at 1216. And, in any event, Rosen's argument does not overcome the fact that I.U.'s refusal to pursue charges or to testify against the PE teacher would seriously inhibit any investigation or trial.

All considered, it was not "irrational and abusive," nor was it "wholly unrelated to any legitimate state activity," for the TCSO defendants to investigate Rosen while declining to investigate the PE teacher. The TCSO defendants' decision to do so therefore did not violate Rosen's right to equal protection. Accordingly, we affirm the district court's grant of summary judgment on Rosen's Fourteenth Amendment equal protection claim.

### III.

We turn now to Crothers. On appeal, Crothers raises a Fourteenth Amendment right-to-fair trial claim and a Fourth Amendment malicious prosecution claim. Crothers's claims, like Rosen's, both fail.

### A.

Before addressing the merits of Crothers's claims, we pause to discuss another preliminary issue that the TCPO defendants raise: whether Crothers's claims are barred under *Heck v. Humphrey*, 512 U.S. 477 (1994). Under *Heck*, an individual who was previously convicted of an offense may not bring a § 1983 damages claim challenging conduct related to their prosecution or conviction if succeeding on their claim would necessarily imply that their conviction is invalid. *Id.* at 489–90. The TCPO defendants argue before us (and likewise argued in their motion for summary judgment) that Crothers's claims are barred by *Heck* "[b]ecause [a] favorable ruling on Crothers['s]

claims would require treating Crothers'[s] convictions and sentences as suspect and perhaps invalid." TCPO Br. at 44–45; *see* App'x Vol. I at 230–31; App'x Vol. II at 292.

The district court did not address the *Heck* bar. We ultimately do not reach the issue, either. But it is important to explain why. Usually, *Heck* permits courts to dismiss a claim at the outset of litigation. *See, e.g.*, *Smith v. Veterans Admin.*, 636 F.3d 1306, 1312 (10th Cir. 2011); *cf. Baldauf v. Hyatt*, 120 F. App'x 288, 289 (10th Cir. 2005) (describing *Heck* as a "threshold issue"). And, in some ways, *Heck* resembles other doctrines that deprive federal courts of jurisdiction to consider claims that collaterally attack a prior judgment, such as the *Rooker-Feldman* doctrine. *Cf. Graff v. Aberdeen Enterprizes, II, Inc.*, 65 F.4th 500, 521–22 (10th Cir. 2023) (suggesting analytical overlap between *Heck* and *Rooker-Feldman*). Thus, *Heck* looks and functions—to some extent—like a jurisdictional bar.

This "raises an order-of-operations question." *Kitchen v. Whitmer*, 106 F.4th 525, 533 (6th Cir. 2024). We have an obligation to assure ourselves of our subject-matter jurisdiction, *see Shields L. Grp., LLC v. Stueve Siegel Hanson LLP*, 95 F.4th 1251, 1279 (10th Cir. 2024), and so if *Heck* is jurisdictional, we must address it before proceeding to the merits of Crothers's claims, *see Kitchen*, 106 F.4th at 533. In our Circuit, however, it remains somewhat of an open question whether *Heck* is jurisdictional. *See Graff*, 65 F.4th at 520 n.28; *Johnson v. Spencer*, 950 F.3d 680, 697 (10th Cir. 2020); *Jiron v. City of Lakewood*, 392 F.3d 410, 413 n.1 (10th Cir. 2004).

The majority of circuits have held (albeit in a variety of contexts) that *Heck* is not a jurisdictional bar, but rather is a doctrine governing the scope of § 1983, which

22

implicates whether a plaintiff can state a claim for relief at all. *See Kitchen*, 106 F.4th at 533–34 ("[T]he *Heck* question . . . ask[s] which of two possible causes of action is 'valid,' rather than going to the 'courts' statutory or constitutional *power* to adjudicate the case'" (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (emphasis in original))); *Brunson v. Stein*, 116 F.4th 301, 305–07 (4th Cir. 2024) ("[T]he upshot of *Heck*'s holding . . . is that when [] a plaintiff *does not* show favorable termination, that plaintiff has no cause of action and thus fails to state a claim." (emphasis in original)); *Colvin v. LeBlanc*, 2 F.4th 494, 498–99 (5th Cir. 2021) ("*Heck* implicates a plaintiff's ability to state a claim, not whether the court has jurisdiction over that claim."); *Vuyanich v. Smithton Borough*, 5 F.4th 379, 389 (3d Cir. 2021) ("*Heck* does not implicate a federal court's jurisdiction; thus there is no need to reach Defendants' *Heck* argument at this time. The District Court is free to consider it and Defendants' other alternative arguments for dismissal as appropriate on remand."); *Polzin v. Gage*, 636 F.3d 834, 837–38 (7th Cir. 2011) ("The *Heck* doctrine is not a jurisdictional bar. . . . [D]istrict courts may bypass the impediment of the *Heck* doctrine and address the merits of the case."); *cf. Teagan v. City of McDonough*, 949 F.3d 670, 678–79 (11th Cir. 2020) (noting that the Eleventh Circuit has "not definitively answered" whether *Heck* is a "jurisdictional rule," but suggesting that *Heck* is not jurisdictional and addressing the merits of the plaintiff's claim instead); *Washington v. L.A. Cnty. Sheriff's Dep't*, 833 F.3d 1048, 1054–55 (9th Cir. 2016) (holding that a dismissal under *Heck* is a dismissal for a "failure to state a claim" "when *Heck*'s bar to relief is obvious from the face of the complaint").

Although our Circuit has not explicitly held that *Heck* is non-jurisdictional, we understand our cases to say as much. In *Jiron v. City of Lakewood*, we resolved an appeal based on our "evaluation of the substance of [the plaintiff's] claims" and expressly declined to "address the *Heck* issue." 392 F.3d at 413 n.1. Thus, as we later recognized in *Johnson v. Spencer*, *Jiron* at least "indicated" that "*Heck* is *not* jurisdictional." 950 F.3d at 697 (emphasis in original). Although *Johnson* labeled that proposition from *Jiron* as "dicta," we nevertheless suggested (but still without deciding) that *Heck* is, indeed, not a jurisdictional bar.[11] *See id.* at 695–98. Later, in *Graff v. Aberdeen Enterprizes, II, Inc.*, we again declined to definitively decide whether *Heck* presents a jurisdictional bar, both because we concluded that the plaintiff's claims were not *Heck*-barred to begin with and because "neither party raise[d] the issue, let alone explain[ed] how it might affect the way" we proceeded in resolving the appeal. 65 F.4th at 521–22 & n.28.

In other circumstances, too, our Circuit has repeatedly expressed that *Heck* bears on a plaintiff's ability to state a claim, not on jurisdiction. *See, e.g.*, *Smith*, 636 F.3d at 1312 (observing "that the dismissal of a civil rights suit for damages based on prematurity under *Heck* . . . is for failure to state a claim," and that *Heck* held that "the favorable termination of a habeas case is an *essential element* of a prisoner's civil claim for damages" brought under § 1983 (emphasis in original)); *Pierce v. Gilchrist*, 359 F.3d 1279, 1294 (10th Cir. 2004) (stating that *Heck* "recognized [the favorable-termination]

---

[11] *Johnson* declined to decide whether *Heck* is jurisdictional because the procedural posture of the case—review of the denial of a Rule 60(b)(4) motion—only required us to determine whether the district court there had an "arguable basis" to exercise jurisdiction over two prior actions. *See* 950 F.3d at 697–98.

element *as part of* a § 1983 claim for unconstitutional conviction or imprisonment" (emphasis added)); *Davis v. Kan. Dep't of Corr.*, 507 F.3d 1246, 1248–49 (10th Cir. 2007) (affirming, on *Heck* grounds, the dismissal of a plaintiff's § 1983 action for failure to state a claim).

Moreover, the fact that we have bypassed the *Heck* issue and addressed a plaintiff's claim on the merits, *see Jiron*, 392 F.3d at 413 n.1, indicates that our Circuit, like the majority of others, treats *Heck* as a non-jurisdictional bar. And it makes sense to do so. A close look at *Heck* reveals why its rule is not jurisdictional: by its terms, *Heck* only addressed whether a damages claim that "call[s] into question the lawfulness of conviction or confinement . . . . is cognizable under § 1983 at all." 512 U.S. 477, 489–90 (1994); *see, e.g.*, *id.* at 486–87 (describing favorable termination as an "element" that a "plaintiff must prove" in order to state a claim for damages under § 1983). In other words, *Heck* was concerned with whether such actions may properly state a claim under § 1983—not whether courts have jurisdiction to consider such actions at all.

Thus, we conclude that *Heck* does not present a jurisdictional bar. The district court was therefore free—as are we—to bypass the *Heck* issue and instead address the merits of Crothers's claims.

**B.**

Having determined that we may appropriately consider the merits of Crothers's claims, we now consider each in turn. First, we address Crothers's Fourteenth Amendment right-to-fair-trial claim. Crothers argues that the TCPO defendants deprived him of his right to a fair trial because they coordinated with the media to release false and

25

prejudicial statements about Crothers, which sensationalized his prosecution and led to a "zoo"-like trial atmosphere. That trial atmosphere, Crothers claims, was so extreme as to presumptively prejudice him—even though the jury acquitted him on half of the charges, including the sexual battery charge.

The Sixth Amendment guarantees, "[i]n all criminal prosecutions," the right to a trial "by an impartial jury." U.S. Const. amend. VI. "Because 'trial by jury in criminal cases is fundamental to the American scheme of justice,' the Due Process Clause of the Fourteenth Amendment guarantees the same right in state criminal prosecutions." *Neb. Press Ass'n v. Stuart*, 427 U.S. 529, 551 (1976) (quoting *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968)).

Overly sensational pre-trial publicity poses one threat to the right to a fair trial. Due process does not tolerate "kangaroo court proceedings." *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963). After all, no one ought to "be punished for a crime without 'a charge fairly made and fairly tried in a public tribunal free of prejudice, passion, excitement, and tyrannical power.'" *Sheppard v. Maxwell*, 384 U.S. 333, 350 (1966) (quoting *Chambers v. Florida*, 309 U.S. 331, 347 (1946)). Thus, when extreme pre-trial publicity creates a "carnival atmosphere at trial" such that "bedlam reign[s] at the courthouse"—and when government conduct exacerbates that atmosphere—it may violate an accused's rights to due process and a fair trial. *Id.* at 355, 358; *see Hale v. Gibson*, 227 F.3d 1298, 1332 (10th Cir. 2000) (observing that an overly pervasive media influence can violate due process and the right to a fair trial where it "create[s] either a circus atmosphere in the court room or a lynch mob mentality").

26

But pre-trial publicity alone does not always taint the right to a fair trial. "Prominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*" of the facts or public interest involved in a case. *Skilling v. United States*, 561 U.S. 358, 381 (2010) (emphasis in original). To that end, the Supreme Court has observed that "pre-trial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Neb. Press Ass'n*, 427 U.S. at 554.

Instead, a party who alleges that pre-trial publicity deprived them of their right to a fair trial must demonstrate prejudice. *See Skilling*, 561 U.S. at 381. A party can demonstrate actual prejudice by showing that media coverage actually biased the jury, such as when prospective jurors express a pre-trial "opinion as to guilt" or when a juror admits to prejudice after the fact. *Irvin v. Dowd*, 366 U.S. 717, 727–28 (1961). Alternatively, a party may be entitled to a presumption of prejudice when they demonstrate that media influence "utterly corrupted" the trial atmosphere. *Skilling*, 561 U.S. at 380 (quotation omitted). Still, the Supreme Court has emphasized that a "presumption of prejudice . . . attends only the extreme case." *Id.* at 381.

Crothers seems to base his right-to-fair-trial claim on presumed prejudice. That being so, Crothers was required to show that "'the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings' . . . and created either a circus atmosphere in the court room or a lynch mob mentality such that it would be impossible to receive a fair trial." *Hale*, 227 F.3d at 1332 (quoting *Murphy*, 421 U.S. at 799).

27

To demonstrate presumed prejudice, Crothers points to several pieces of evidence. First, he contends that Allan—the TCPO prosecutor—harbored animosity toward him, at one point stating, "I have been waiting my entire career for a case like this. I'm sick and tired of these rich guys . . . having zero regard for the law and drinking and using drugs with no consequences." Aplt. Br. at 29. Relatedly, Crothers contends that, before charges were brought against him, Allan "accurately predicted a future newspaper article" about the charges, which demonstrates that Allan coordinated with the media to publicize the allegations. *Id.*[12]

Even assuming those contentions are true, Allan's alleged animosity toward Crothers does not move the needle toward presumed prejudice. That is because even if Allan harbored animosity toward Crothers, had some ulterior motive for the prosecution, or knew that the charges would be publicized in a newspaper article, Crothers has failed to show how any of those influences "pervaded the proceedings" or "created either a circus atmosphere in the court room or a lynch mob mentality such that it would be impossible to receive a fair trial." *Hale*, 227 F.3d at 1332 (quotation omitted).

To be sure, Crothers asserts that the trial atmosphere was like a "zoo." Aplt. Br. at 29. Indeed, according to Crothers, Allan himself described the trial that way and stated that he had "never seen" any atmosphere like it in twenty-plus years of trying cases. *Id.*

---

[12] Crothers claims that it is undisputed that "[f]ourteen newspaper articles followed through sentencing." Aplt. Br. at 29. But, as the district court found, "[t]here is no evidence supporting [Crothers]'s proffered fact[.]" R. at 34. And Crothers does not argue on appeal that this finding was somehow clearly erroneous. For that reason, we will not rely on the finding as Crothers characterizes it.

The trial had a "packed courtroom" with a "line of people waiting to get in," and during the trial, "some kids were throwing what appeared to be 'gang signs,'" disrupting the proceedings so much that the trial judge asked one of them to leave.  *Id.*

Even so, those circumstances do not amount to an unconstitutional trial atmosphere.  Simply describing the trial atmosphere as a "zoo" does not make it so. Crothers does not argue that the number of people present in the courtroom "caused frequent confusion and disruption of the trial," nor does he argue that the trial atmosphere created "distractions, intrusions[,] or influences" that negatively affected the jury or other trial participants.  *Sheppard*, 384 U.S. at 355.  Moreover, Crothers does not suggest that "the judge lost his ability to supervise [the] environment," *id.*—indeed, the fact that the judge asked disruptive individuals to leave suggests that the environment remained controlled.

Finally, we note one other circumstance that the Supreme Court has termed "of prime significance," *Skilling*, 561 U.S. at 383:  the fact that the jury acquitted Crothers of three of his six charges.  The Court in *Skilling* noted that verdicts of acquittal—including split verdicts—tend to weigh against prejudice.  *Id.* at 383–84 ("It would be odd for an appellate court to presume prejudice in a case in which jurors' actions run counter to that presumption.").  Accordingly, the fact that the jury acquitted Crothers of three of his charges—including his one sexual-assault charge—indicates that neither media coverage nor the TCPO defendant's conduct rendered his trial unfair.

All told, this is not the "extreme case" contemplated by *Skilling*.  Crothers has failed to demonstrate that the TCPO defendants deprive him of his right to a fair trial.

29

We therefore affirm the district court's grant of summary judgment on Crothers's Fourteenth Amendment right-to-fair-trial claim.

## C.

Next, we consider Crothers's Fourth Amendment claim for malicious prosecution. In essence, Crothers claims that either (or both) the TCSO or TCPO defendants (though he does not say which) violated his Fourth Amendment rights by maliciously prosecuting him without probable cause. Before the district court, Crothers argued that he was not required to demonstrate, as part of his malicious prosecution claim, that he was "seized." Now, on appeal, Crothers seems to argue that he *was* seized because he was required to stand trial under Wyoming law. Because Crothers did not advance this latter argument before the district court, we deem it waived, as explained below. To the extent that Crothers stands by his earlier argument, we reject that position as well.

"We have repeatedly recognized in this [C]ircuit that, at least prior to trial, the relevant constitutional underpinning for a claim of malicious prosecution under § 1983 must be 'the Fourth Amendment's right to be free from unreasonable seizures.'" *Becker v. Kroll*, 494 F.3d 904, 914 (10th Cir. 2007) (quoting *Taylor v. Meacham*, 82 F.3d 1556, 1561 (10th Cir. 1996)). "That is because the gravamen of the Fourth Amendment claim for malicious prosecution . . . is the wrongful initiation of charges without probable cause. And the wrongful initiation of charges without probable cause is likewise the gravamen of the tort of malicious prosecution." *Thompson v. Clark*, 596 U.S. 36, 43 (2022). Because a § 1983 malicious prosecution

30

claim "is housed in the Fourth Amendment," a plaintiff asserting such a claim must "prove that the malicious prosecution resulted in a seizure of the plaintiff." *Id.* at 43 n.2 (citing *Manuel v. Joliet*, 580 U.S. 357, 365–66 (2017)).

This poses a problem for Crothers. Applying this legal framework, the district court rejected Crothers's position that he did not have to demonstrate that he was "seized." R. at 59. Instead, the district court explained that our decision in *Becker*, coupled with the Supreme Court's decision in *Thompson*, together stand for the proposition that all malicious prosecution claims based on the Fourth Amendment require the plaintiff to demonstrate that they were seized. Accordingly, the district court held that Crothers's claim failed because he did not "raise[] facts indicating he was seized under the Fourth Amendment." R. at 59.

On appeal, Crothers changes course. Abandoning, to some degree, his earlier position that he was not required to demonstrate a seizure, Crothers now argues that he *was* seized because he was required to stand trial under Wyoming law. But because Crothers did not advance this argument below, he forfeited it. *Havens v. Colo. Dep't of Corr.*, 897 F.3d 1250, 1259 (10th Cir. 2018) ("We ordinarily deem arguments that litigants fail to present before the district court but then subsequently urge on appeal to be forfeited."). We ordinarily review such forfeited arguments for plain error. *See id.* But because Crothers failed to argue plain error on appeal, we "deem the issue waived (rather than merely forfeited) and decline to review the issue at all—for plain error or otherwise." *United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019).

31

Crothers insists that he did not waive this issue—at least not in its entirety—because his arguments at the district court and before us both center on a distinction between malicious prosecution claims based on charges that are dismissed before trial and those based on charges that proceed to trial. As Crothers frames things, both of his arguments asserted that our decision in *Becker* only requires a litigant to demonstrate a "seizure" when a malicious prosecution claim is based on charges that were dismissed before trial; when a claim is based on charges that proceeded to trial, by contrast, the trial itself constitutes the seizure, so a litigant need not demonstrate any separate seizure over and beyond that.

Even if we were to understand Crothers's argument that way, it still fails. As explained, a plaintiff asserting a Fourth Amendment malicious prosecution claim must "prove that the malicious prosecution resulted in a seizure of the plaintiff." *Thompson*, 596 U.S. at 43 n.2 (citing *Manuel*, 580 U.S. at 365–66). Although *Becker* dealt with malicious prosecution claims based on charges that were dismissed before trial, nothing in our decision cabined the seizure requirement to that context. *See* 494 F.3d at 914. Our qualifying language there simply cautioned that the Fourth Amendment—not the Fourteenth Amendment—was the primary basis for pre-trial malicious prosecution claims. *See id.* That is why we stated that "a seizure is necessary to support a § 1983 malicious prosecution claim based on the initiation of criminal proceedings that are dismissed before trial." *Id.* But we did not limit the seizure requirement to those types of claims; to the contrary, we suggested that the seizure requirement applies whenever the

32

Fourth Amendment supplies the "relevant constitutional underpinning" for a malicious prosecution claim. *Id.*

To that end, *Becker* rejected "a broad[] theory of seizure" that would encompass "requiring a person to post bond, *compelling a person to appear in court*, or imposing restrictions on a person's right to interstate travel." *Id.* at 914–15 (citing *Albright v. Oliver*, 510 U.S. 266, 278 (1994) (Ginsburg, J., concurring)) (emphasis added). Instead, the "seizure" must be either an "arrest or imprisonment." *Id.* at 914.

*Becker* thus forecloses the distinction that Crothers tries to draw. In order to prevail on his claim, Crothers was required to show that he was seized, either through an arrest, imprisonment, or some other analogous or traditional means. He has made no effort to do so. Accordingly, we affirm the district court's grant of summary judgment on Crothers's Fourth Amendment malicious prosecution claim.

## IV.

Having disposed of Rosen's and Crothers's individual claims, we now address their combined claims for municipal liability under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). Rosen and Crothers argue that Teton County Sheriff Matt Carr and Teton County Prosecuting Attorney Erin Weisman, in their official capacities as senior policymakers for the TCSO and TCPO, respectively, executed policies that caused Rosen's and Crothers's constitutional injuries.

## A.

First, Weisman alone argues (as she did before the district court) that she is entitled to Eleventh Amendment sovereign immunity. TCPO Br. at 37. Weisman does

33

not specify the claims for which she is entitled to Eleventh Amendment immunity. But we construe her argument as relating to the plaintiffs' *Monell* claims because "Eleventh Amendment sovereign immunity bars suits for money damages against . . . state officers in their official capacities," *Chilcoat v. San Juan County*, 41 F.4th 1196, 1213 (10th Cir. 2022), and the *Monell* claims are the only ones brought against Weisman in her official capacity.

Generally, "if a state affirmatively raises an Eleventh Amendment immunity defense, [courts] are required to address the defense as a 'threshold jurisdictional matter.'" *Jones v. Courtney*, 466 F. App'x 696, 699 (10th Cir. 2012) (quoting *United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 942 (10th Cir. 2008)). Here, however, the district court did not address Eleventh Amendment immunity at all, instead disposing of the *Monell* claims on the merits. While that approach presents an unusual procedural context, we conclude that it was appropriate for the district court to resolve the *Monell* claims on the merits, rather than to first address Weisman's Eleventh Amendment argument.

Several things lead us to this conclusion. First, we have previously held that when a state or state official raises the Eleventh Amendment *only* as a conditional or alternative grounds for affirmance, "a federal court may address the merits-related question *before* reaching the Eleventh Amendment question." *Orenduff*, 548 F.3d at 941 (emphasis in original). This approach, we explained in *Orenduff*, is permissible in light of the nature of Eleventh Amendment immunity: although the immunity "contain[s] traits [] akin to subject-matter jurisdiction," it also possesses unique features, including that it may be

34

raised at any time, may be waived by the affected party, and need not be raised *sua sponte* by a court when not raised by a party. *Id.* at 941–42. Those features make evident that "a state defendant retains broad discretion over whether a court must hear an Eleventh Amendment argument." *Id.* at 942. And because a state defendant controls whether and when a court must resolve an Eleventh Amendment argument, that defendant may "insist upon [their Eleventh Amendment argument] *only if* it is necessary to prevent judgment against them on the merits." *Id.* at 943 (quoting *McLendon v. Ga. Dep't of Cmty. Health*, 261 F.3d 1252, 1258 (11th Cir. 2001)) (emphasis in original).

Here, we interpret Weisman's argument to present Eleventh Amendment immunity only as an alternative grounds for affirmance. For one thing, Weisman mentions the Eleventh Amendment in the seventh section of her argument—only after raising her arguments on the merits. *See* TCPO Br. at 36–37. Moreover, Weisman begins that section by noting that "[t]his Court may affirm summary judgment on any basis," *id.* at 37, thereby suggesting that the arguments raised in that section are alternatives to her merits-based arguments. And Weisman's Eleventh Amendment argument is cursory at best: in both her motion for summary judgment and her appellee brief, Weisman only mentions the Eleventh Amendment in two short sentences, making no attempt to explain *why* she is entitled to immunity. *See id.*; App'x Vol. I at 214. Weisman's cursory treatment of the issue indicates to us that she does not intend it to be a primary or threshold argument.

Because Weisman raises her Eleventh Amendment argument only as an alternative grounds for affirmance, we may appropriately resolve the merits of Rosen and Crothers's

35

*Monell* claims first. *Orenduff*, 548 F.3d at 942–44. And, as explained below, we affirm the grant of summary judgment on the *Monell* claims in Weisman's favor—so we ultimately need not reach the Eleventh Amendment issue at all.

**B.**

We now address the merits of Rosen and Crothers's *Monell* claims. Although a municipality is generally not directly liable for the constitutional torts of its employees, *Monell* carves out an exception under which a municipality is liable if it executes an unconstitutional policy or custom, or a facially constitutional policy that causes a constitutional violation. 436 U.S. at 694.

"To prove such a *Monell* claim, a plaintiff must first show a municipal policy or custom—either an official rule or one so entrenched in practice as to constitute an official policy." *Finch v. Rapp*, 38 F.4th 1234, 1244 (10th Cir. 2022). "Next, a plaintiff must show that the municipality was deliberately indifferent to constitutional violations that were the obvious consequence of its policy." *Id.* (citing *Crowson v. Washington County*, 983 F.3d 1166, 1188 (10th Cir. 2020)). "Finally, a plaintiff must show that the policy directly caused his constitutional injury." *Id.* (citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)).

Rosen and Crothers acknowledge that the success of their § 1983 municipal *Monell* claims rises and falls with that of their Fourth and Fourteenth Amendment claims. *See* Aplt. Br. at 21. As explained above, Rosen and Crothers have failed to raise a genuine question of material fact as to any of their § 1983 claims. Consequently, they cannot make out their *Monell* claims because they cannot establish municipal liability or

36

individual supervisory liability.  *See, e.g.*, *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) (holding that the absence of a constitutional violation by city officers "precludes the imposition of any liability against" a city itself through a *Monell* claim). We therefore affirm the district court's grant of summary judgment in favor of Carr and Weisman in their official capacities with respect to Rosen and Crothers's *Monell* municipal liability claims.

## V.

Finally, we address Rosen and Crothers's state law claims.  "[D]istrict courts may decline to exercise supplemental jurisdiction over a [state law] claim . . . if the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  As in "the usual case in which all federal-law claims are eliminated before trial," here, the district court reasoned that "the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—[] point[ed] toward declining to exercise jurisdiction over the remaining state law claims."  *Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, 956 F.3d 1228, 1238 (10th Cir. 2020) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

Because each of Rosen's and Crothers's federal claims fail, we hold that the district court did not abuse its discretion in denying supplemental jurisdiction over their state law claims.  *See, e.g.*, *Nielander v. Bd. of Cnty. Comm'rs*, 582 F.3d 1155, 1172 (10th Cir. 2009) (reviewing the denial of supplemental jurisdiction for abuse of discretion).

## VI.

For the foregoing reasons, we AFFIRM.

Entered for the Court

Allison H. Eid
Circuit Judge